Janette HOPPER, and Sharon Rupp,
Plaintiffs–Appellants,

v.

CITY OF PASCO, and Arts Council
of the Mid–Columbia Region,
Defendants–Appellees.

No. 98–35795.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 2000

Filed Feb. 15, 2001

Paul J. Lawrence, Preston Gates & Ellis, LLP, Seattle, Washington, Cooperating Attorney for the American Civil Liberties Union—Washington, for the plaintiffs-appellants.

John G. Schultz (argued) and George Fearing, Leavy, Schultz, Davis & Fearing, Kennewick, Washington; for defendant-appellee City of Pasco.

Before: BROWNING, McKEOWN, and GOULD, Circuit Judges.

Opinion by Judge McKEOWN; Partial Concurrence and Partial Dissent by Judge GOULD.

McKEOWN, Circuit Judge:

This case is a study in the politics and law of public art. Janette Hopper and Sharon Rupp are artists whose works were excluded from public display at the Pasco City Hall Gallery in Pasco, Washington, because city officials deemed their art too

"controversial." As the district court put it: "The gist of the case is that plaintiffs were invited to display their work at city hall, and then summarily disinvited when their submissions provoked controversy." The parties agree that the art is not obscene or pornographic. Instead, the case boils down to a matter of taste and perception. Hopper and Rupp filed suit against the City of Pasco ("Pasco") under 42 U.S.C. § 1983 for violation of their First Amendment rights. The district court granted Pasco's motion for summary judgment, and denied Hopper and Rupp's motion for partial summary judgment, holding that the city hall is a non-public forum and that Pasco's decision to exclude their works was reasonable.[1]

We hold that Pasco violated the artists' First Amendment rights by creating a designated public forum and then excluding their artwork without a compelling governmental interest. Therefore, we reverse the district court's grant of summary judgment for Pasco, reverse the district court's denial of Hopper and Rupp's motion for partial summary judgment, and remand for further proceedings.

## I. BACKGROUND AND PROCEDURAL HISTORY

In 1994, Pasco remodeled an abandoned school building to create a new city hall. Faced with an expanse of barren walls, Gary Crutchfield, the City Manager, and his administrative assistant, Kurt Luhrs, decided to invite local artists to display their works in the public hallways. Rather than expend limited resources to have the city administer an arts program, Crutchfield and Luhrs commissioned the Arts Council, a private organization, to manage the program for $500 a quarter, for at least one year. According to their agreement, each quarter the Arts Council would

make arrangements to exhibit artwork, provide hanging supplies, design and mount the exhibit, publish and mail a flyer to announce the exhibit, and issue press notices.[2] If the program proved successful, Crutchfield planned to seek permanent funding from the City Council.

At the outset, Luhrs and Crutchfield sought to avoid controversy. Indeed, an uncontroversial program was a prerequisite, in their view, to eventually obtaining permanent funding from the City Council. Luhrs made this clear in the following letter to Barbara Gurth, Director of the Arts Council:

Following our conversation this morning, I felt it was important to provide you with some assurances regarding the city's commitment to developing an art gallery in the new city hall. The City Manager and I are very excited about this program and feel that it will certainly benefit Pasco residents as well as regional artists.

In order to develop a broad base of support, we felt it would be advantageous to present a "demonstration project" for the council and citizens to appreciate. This would be the most effective way to garner the support needed for an annual or long term commitment, prior to bringing the issue into the public forum at a council meeting. The logic being that if you can see what we are talking about, you can appreciate the value of it to the community as a whole.

During our conversation I got the impression that your board felt that our approach may not be a commitment to the long term management of such a project. This is far from the case. Both Gary and I feel that this approach

---

1. The artists also pled a cause of action for breach of contract against the Arts Council of the Mid–Columbia Region ("Arts Council"), the local artists' association hired to coordinate the display of works at Pasco City Hall. After granting Pasco's motion for summary judgment on the federal claim, the district

court declined to exercise supplemental jurisdiction over the breach of contract claim.

2. The initial funds came from Crutchfield's discretionary account for the maintenance of city hall.

will ensure support when we bring this item to council in a public meeting. *Personally, my greatest fear is bringing such a program to council and having various citizens with a conservative "bent" raise issues that have caused trouble for the National Endowment for the Arts, i.e. offensive or politically motivated art. Through our discussions, I feel assured that the Arts Council will not use the City Hall Gallery as a venue for controversy. Nevertheless, without a demonstration, I feel that the ungrounded fears of a few citizens would ruin this great opportunity for introducing the arts to our citizens.*

*In conclusion, please assure your board that the City of Pasco is very interested in a long term relationship. We are willing to pay for the reasonable costs to plan and develop this show on its own, should the cost exceed the average $500 per quarter.*

(Emphasis added).

Likewise, in an initial notice to announce the arts program and to invite submissions, Gurth repeated Luhrs' admonition:

*Requirements for acceptance: Artworks will not be jured [sic] in the usual sense, but all works will be screened for content and professional presentation....*

*Subject matter: Wide open, but with the restraints that would be accepted with a public arts project paid for with public money.* To offer a quote from a city official's letter regarding this project "... my greatest fear is ... having various citizens ... raise issues that have caused trouble for the National Endowment for the Arts, i.e., offensive or politically motivated art. Through our discussions I feel assured that the Arts Council will not use the City Hall Gallery as a venue for controversy."

Indeed, the Arts Council will not. We have worked for five years to bring the cities on board for the arts, we will not jeopardize our progress. Additionally, *I do not think that regional art in this area presents a problem in this regard, but the Council will reserve the right to reject a subject matter that the committee feels may present a problem for a conservative public sector ....*

(Emphasis added).

Despite these admonitions, the arts program was run without any pre-screening process, and the city provided no further definition or guidance as to what kind of work would be considered inappropriate. There was no selection process to monitor quality, content, or controversy. As a result, the Arts Council rejected no artwork during the entire length of the program, which included three separate exhibits that ran from October 1995 through March 1996. According to Gurth's deposition testimony:

Gurth: We didn't select the artists. We did not pass any qualitative judgment on anybody, or the work, either. We just simply said: These are the people who have agreed to hang this month and we can take this many. So it wasn't a selection process. It wasn't a jurying process at all.

Q: How did you decide who would be, for lack of a better word, chosen, as opposed to selected like a jury process?

Gurth: They chose themselves. This is a small area and there aren't that many practicing artists that work. So the question with this project from its inception was always how long will we sustain it.... So it was never a question of selecting anybody. It was just simply these people coming forward and saying we would like to hang this month and we took them....

Q: Did Mr. Luhrs give you a definition or an understanding at this particular point of what he considered to be objectionable art?

Gurth: No, we never discussed that.

Nor did the city review works prior to their placement in the gallery. Instead, the artist simply provided a list of works to be included and signed a contract with the Arts Council agreeing to leave the works up for the full three months of the exhibit and to give the Arts Council a twenty percent commission on any pieces purchased.

Although it is undisputed that no one pre-screened or otherwise rejected art prior to the exclusion of the works by Hopper and Rupp, there is conflicting evidence as to the reason for failure to pre-screen. Gurth testified that it "was always understood" that the city had the ultimate say as to what kind of art would be displayed. But Crutchfield assumed the Arts Council would screen for content, and Luhrs testified that he expected and trusted Gurth to make sure that no "offensive or politically-motivated art" would be shown because "she knew the artists in the region and she knew who to invite and ... who not to invite."

The first two exhibits (by artists other than Hopper and Rupp) were well received, but not without controversy. One piece, a large sculpture referred to alternately as "After the Famine" and "Starving Man," received a number of complaints but was not removed. The sculpture depicted an emaciated, "dark complected" man and was placed in front of the Housing and Support Services Office. One of the employees who worked in that office complained that a starving man "didn't send a good message," and wanted it removed. Others thought it was ugly, and in a newspaper article Luhrs stated that "Some people saw racial issues, some saw gender issues, some just didn't think it was art." Although Luhrs brought the complaints to Crutchfield's attention, the piece remained for the full length of the exhibit. The first two exhibits also included works containing nudity, although there were ap-

parently no complaints and certainly no efforts to exclude the works from the exhibition.

Unlike most of the artists who provided works for the Pasco City Hall Gallery, neither Hopper nor Rupp received the initial notice sent by Gurth. Rather, both were independently solicited by the Arts Council to display their art in the third exhibit, which ran from February to April 1996. Each signed the standard contract with the Arts Council.

Rupp agreed to show three small bronze sculptures. The first, entitled "Working it Out," depicts a woman struggling with a large box on her head. The second sculpture, entitled "Orchid" or "Retaliation," is a floral piece. Her third sculpture, which was the source of the controversy, is entitled "To the Democrats, Republicans and Bipartisans," "Damn, I'm Stuck," or "A Woman Drinking from A Brook." It depicts a large, nude, headless woman, either lying or standing against a flat surface.[3] Her naked back side faces the viewer. All three works were displayed in a glass case on the main floor of City Hall for a single week in February 1996.

Hopper also signed a contract for the third exhibit, agreeing to show a series of ten linoleum prints entitled "Adam and Eve." The prints depicted a naked couple (in silhouette and outline form) in a variety of landscapes and scenes from post-World War II Germany. Although none of the prints depict explicit sexual activity, in two the couple is kissing, and in several they are embracing. At the time she was contacted about displaying her work, Hopper informed a representative of the Arts Council that her work contained nudity. The representative assured her that nudity would not be a problem, however, given that previous exhibitions at the gallery contained nudity. Two of the rejected pieces were also on display at the Portland Art Museum.

---

**3.** It is unclear from the record whether the statue was displayed horizontally, in which case the woman would appear to be lying down, or vertically, in which case she would seem to be standing.

Both artists' works caused controversy. Luhrs received complaints about "To the Democrats, Republicans and Bipartisans" soon after the display went up. Some viewed the sculpture as depicting the woman in a "sexual position" or as depicting a "sexual act;" others simply thought it "offensive and disgusting," or "derogatory to women." After discussing the matter with Crutchfield, Luhrs ordered the Arts Council to remove all three sculptures from the display case. In a letter sent shortly after the incident, Luhrs told Rupp:

> The city's art gallery project is a voluntary effort on the part of the City of Pasco to provide a venue for artists to display their work. Our city administration firmly believes that this program is a great service to our community and to the arts community in general. Nevertheless, we are somewhat limited in the subject matter which we can display. We firmly believe that this program should remain out of the political realm. Displaying art which could be misconstrued by activists as *"sexual"* or *"prurient,"* will make the decision whether to maintain the program a political one, thereby endangering the entire program. For this reason we must be sensitive to art work presented for the entire program. This process should have occurred prior to you committing your art to the display.

(emphasis in original).

Hopper's prints were never even displayed. After Hopper delivered her prints, but prior to their hanging, Luhrs examined them and determined that some were potentially controversial or political because the couple was depicted nude in public, and public nudity is illegal in Pasco. Over the next few days he showed the prints to several City Hall employees in order to get their opinions. The employees found some of the prints "offensive"

and "sexually suggestive." In view of these assessments, Luhrs and Crutchfield decided not to display any of the prints, and Hopper received the same letter Luhrs had sent to Rupp.[4]

Luhrs acknowledged that the prior exhibits included works containing nudity. When asked to explain the apparent inconsistency in displaying those works in the Gallery but barring Rupp and Hopper's works, Luhrs shrugged it off, saying that he did not review all of the previous works.

Shortly after the works were excluded from the Gallery, Crutchfield terminated the arts program altogether, and Hopper and Rupp filed this action. On cross-motions for summary judgment, the district court held that Pasco City Hall is a nonpublic forum, and that Hopper and Rupp produced no evidence that the city intentionally created a forum for public expression by creating the Gallery. The court placed special emphasis on the city's expressed desire to avoid controversial works as proof that it did not intend to open its halls indiscriminately to public expression. Thus, although the court agreed that "[w]hen it came to execution ... the expectation of 'invitation only' turned into a come-one-come-all affair," it reasoned that Pasco's failure to screen the art did not belie its stated intent to restrict access. The court declined to decide whether the arts program was the product of a municipal policy for the purpose of establishing Pasco's liability under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

## II. STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *See Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.1999), *cert. denied*, 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999). Our review is governed by the same standard applied by the trial court

---

**4.** In a meeting with Hopper and Rupp in which they asked the city to reconsider its decision, Luhrs offered to display Hopper's prints on the second floor of the building in a hallway "where there's very little traffic ... not ... a lot of public traffic." Hopper rejected the offer.

under Federal Rule of Civil Procedure 56(c). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *See id.*

## III. ANALYSIS

### A. First Amendment Violation

#### 1. *Categories of Fora*

■ The Supreme Court instructs us that, in assessing a First Amendment claim for speech on government property, "we must identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 797, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). If the forum is public, "speakers can be excluded ... only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* at 800, 105 S.Ct. 3439. If, on the other hand, the forum is non-public, the government is free to restrict access "as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)).

■ Thus, the two main categories of fora are public (where strict scrutiny applies) and non-public (where a more lenient "reasonableness" standard governs). This does not, however, exhaust the universe of categories. Rather, "Forum analysis divides government property into three categories: public fora, designated public fora, and nonpublic fora." [5] *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir.1999), cert. denied, 529 U.S. 1067, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000) (quoting *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 976 (9th Cir.1998)). A designated public forum exists where "the government intentionally opens up a nontraditional forum for public discourse." *Id.* "Restrictions on expressive activity in designated public fora are subject to the same limitations that govern a traditional public forum," *i.e.*, strict scrutiny. *Id.* at 964–965 (citing *International Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)).

■ The designated public forum has been the source of much confusion. As this court has put it, with considerable understatement, "The contours of the terms 'designated public forum' and 'limited public forum' have not always been clear." *DiLoreto*, 196 F.3d at 965 n. 4. Some courts and commentators refer to a "designated public forum" as a "limited public forum" and use the terms interchangeably. But they are not the same, at least not in this circuit.[6] Rather, a limited public forum is a sub-category of a designated public forum that "refer[s] to a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics." *Id.* at 965.[7] "In a

5. The "public fora" to which the Ninth Circuit refers here are "traditional public fora," which the Supreme Court has described as "those places which 'by long tradition or by government fiat have been devoted to assembly and debate.'" *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439 (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. 948). This category includes public streets and parks. *See id.* This case does not involve such a traditional public forum.

6. *See, e.g.*, Sheri M. Danz, *Note, A Nonpublic Forum or A Brutal Bureaucracy? Advocates'*

Claims of Access to Welfare Center Waiting Rooms, 75 N.Y.U. L.Rev. 1004, 1031 n. 151 (2000) ("While the [Supreme] Court seems to use the terms 'designated public forum' and 'limited public forum' interchangeably, lower courts and commentators distinguish these concepts.").

7. *See also New York Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128 n. 2 (2d Cir.1998) ("The Second Circuit has referred to the 'limited public forum' as a sub-category of the designated public forum, where the

limited public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." *Id.* (citing *Rosenberger v. Rector & Visitors of the Univ. of Virginia,* 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Lamb's Chapel v. Center Moriches Union Free Sch.,* 508 U.S. 384, 392–93, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993)).

■ In other words, the fact that the government has opened a nonpublic forum to expressive activity does not determine whether we must apply strict scrutiny or the lower reasonableness standard. Rather, we must examine the terms on which the forum operates to determine whether it is a designated public forum or a limited public forum. If a forum is a "designated public forum," we apply strict scrutiny. But if it is merely a "limited public forum," then we apply the reasonableness test. *See DiLoreto,* 196 F.3d at 965 ("[F]irst we must determine whether the fence was a designated public forum subject to heightened scrutiny or a limited public forum subject to a reasonableness standard.").[8]

## 2. *Designated Public Forum Versus Limited Public Forum*

Here, then, our initial task is to determine whether the Pasco City Hall Gallery constituted a designated public forum or a limited public forum. If we classify the Gallery as a designated public forum, we must decide whether the city's decision to exclude plaintiffs' works was justified by a compelling interest. If, on the other hand, we determine that the Gallery is a limited public forum, we need only decide whether the exclusion was reasonable and viewpoint-neutral.

■ As the Supreme Court observed in *Cornelius,* government intent is the essential question in determining whether a designated public forum has been established:

> The government does not create a public forum by inaction or by permitting limited discourse, but only by *intentionally* opening a nontraditional public forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.

473 U.S. at 802, 105 S.Ct. 3439 (emphasis added) (citing *Perry,* 460 U.S. at 46, 103 S.Ct. 948).

■ The "policy" and "practice" inquiries are intimately linked in the sense that an abstract policy statement purporting to restrict access to a forum is not enough. What matters is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted. Thus in *Cornelius,* where the Court held that a federal fundraising drive was not a designated public forum, the Court emphasized both the existence of a policy and its consistent application:

> The Government's consistent policy has been to limit participation in the [fundraising drive] to "appropriate" voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials. Although the record does not show how

government 'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects.' Exclusions of speech under this category are treated the same as exclusions under non-public fora: '[They] need only be reasonable and viewpoint-neutral to pass constitutional muster.' " (citations omitted)).

**8.** This categorization admittedly leads to the strange semantic result that a limited public forum is *not* actually a public forum. Therefore, in our analysis here, when we refer to a "public forum" (where strict scrutiny applies), we are referring to a designated public forum (where strict scrutiny applies), but *not* to a limited public forum (where the reasonableness test applies).

many organizations have been denied permission throughout the 24–year history of the [fundraising drive], there is no evidence suggesting that the granting of the requisite permission is merely ministerial. The Civil Service Commission ... developed extensive admission criteria to limit access to the Campaign to those organizations considered appropriate. Such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum.

473 U.S. at 804–05, 105 S.Ct. 3439 (citations omitted); *see also Perry,* 460 U.S. at 47, 103 S.Ct. 948 (no designated public forum in a public school's internal mail system where the regular practice was to require permission from the individual school principal before access to the system was granted, and where permission had not been granted "as a matter of course to all who [sought] to distribute material"); *Lehman v. City of Shaker Heights,* 418 U.S. 298, 302–04, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (no designated public forum in advertising space on city buses where a city management contract required control over subject matter of displays, and such control was consistently exercised for more than twenty-five years); *Children of the Rosary v. City of Phoenix,* 154 F.3d 972, 976 (9th Cir.1998) ("[A] review of the city's standards and practices indicates that the city has not opened a public forum [for ads on its bus panels]. The city has consistently restricted political and religious advertising"; upholding the exclusion of a religious anti-abortion ad), *cert. denied,* 526 U.S. 1131, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999).[9]

 Thus, consistency in application is the hallmark of any policy designed to preserve the non-public status of a forum. A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted. *See Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5,* 941 F.2d 45, 47 (1st Cir.1991) (in public forum analysis, "actual practice speaks louder than words").

*Christ's Bride Ministries, Inc. v. SEPTA,* 148 F.3d 242 (3d Cir.1998), *cert. denied,* 525 U.S. 1068, 119 S.Ct. 797, 142 L.Ed.2d 659 (1999), is especially instructive in this regard. There, the Third Circuit considered a regional transit authority's decision to remove a poster ad stating that "Women Who Choose Abortion Suffer More & Deadlier Breast Cancer." *Id.,* 148 F.3d at 244. The ad was removed when the transit authority received a letter in which the Assistant Secretary of Health in the United States Department of Health and Human Services stated that the ad was misleading and did not accurately reflect the weight of scientific evidence. *See id.* at 245. The contract for the ad provided that the transit authority reserved the right to remove any ads it deemed "objectionable." *Id.* at 250–51. The court nevertheless rejected the transit authority's argument that, "because it retained the sole discretion to reject or to remove any advertisement that it deems objectionable, it did not create a public forum of any sort" in transit system advertising space. *Id.* at 251.

The court reached this conclusion after a careful review of the transit authority's past practice with respect to advertising,

---

9. Conversely, an explicit policy *opening* a forum suited to expressive activity is often taken at face value. *See Widmar v. Vincent,* 454 U.S. 263, 267, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (clear intent to create public forum where state university had an explicit policy of making meeting facilities available to registered student groups); *Madison Joint School Dist. No. 8 v. Wisconsin Empl. Relations Comm'n,* 429 U.S. 167, 174 n. 6, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (state statute providing for open school board meetings creates forum for citizen participation); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 555, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (city-leased theater designed and dedicated to expressive activity is a public forum).

noting that it had accepted "a broad range of advertisements for display," ranging from religious and political messages to explicit ads regarding safe sex, abstinence, and AIDS. *Id.* The transit authority had even allowed two ads favoring abortion rights. *Id.* at 251–52. On only three prior occasions had the transit authority requested advertisers to modify their ads. *Id.* at 252. At least in part because of the transit authority's "practice of permitting virtually unlimited access to the forum," the court held that the ad space qualified as a designated public forum. *Id.* Indeed, the court held that the transit authority's long practice of allowing ads on controversial subjects "as a 'matter of course,'" *id.* at 254, trumped the general rule that no public forum is created when the government requires speakers to obtain permission before engaging in expressive activity in the forum. *Id.* at 252–55.

The *Christ's Bride* court followed a Seventh Circuit decision reaching a similar conclusion with respect to advertising space managed by Chicago's transit authority. In *Planned Parenthood Ass'n v. Chicago Transit Auth.*, 767 F.2d 1225 (7th Cir.1985), the transit authority refused to lease ad space to Planned Parenthood for abortion-related displays. Other than a "general contractual directive . . . to refuse vulgar, immoral, or disreputable advertising," the court found that the transit authority maintained no policy or system of control over the ads it accepted and that it "ha[d] allowed its advertising space to be used for a wide variety of commercial, public-service, public-issue, and political ads." 767 F.2d at 1232–33. Under these circumstances, the court held that the advertising space was a designated public forum. Other courts have held likewise. *See, e.g., United Food & Commercial Workers Union Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 353 (6th Cir.1998) (following *Christ's Bride* and noting that "[w]e . . . must closely examine whether in practice [the transit authority] has consistently enforced its written policy in order to satisfy ourselves that [its] stated policy represents its actual policy"); *Air Line Pilots Ass'n Int'l v. Dept. of Aviation*, 45 F.3d 1144, 1153 (7th Cir.1995) ("The government may not 'create' a policy to implement its newly-discovered desire to suppress a particular message. *Neither may the government invoke an otherwise unenforced policy to justify that suppression.* Therefore, the government's stated policy, without more, is not dispositive with respect to the government's intent in a given forum.") (emphasis added) (citations omitted).

■ Courts have also been reluctant to accept policies based on subjective or overly general criteria. "'[S]tandards for inclusion and exclusion' in a limited public forum 'must be unambiguous and definite' if the 'concept of a designated public forum is to retain any vitality whatever.'" *Christ's Bride*, 148 F.3d at 251 (quoting *Gregoire v. Centennial Sch. Distr.*, 907 F.2d 1366, 1375 (3d Cir.1990)). Absent objective standards, government officials may use their discretion to interpret the policy as a pretext for censorship. *See Board of Educ. v. Mergens*, 496 U.S. 226, 244–45, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (generalized definition of permissible content poses risk of arbitrary application); *Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 845–46 (6th Cir.2000) ("broad discretion [given] to city officials [raises] possibility of discriminatory application of the policy based on viewpoint"); *Cinevision Corp. v. City of Burbank*, 745 F.2d at 560 (9th Cir.1984) (vague standard has "potential for abuse"); *Gregoire*, 907 F.2d at 1374–75 ("virtually unlimited discretion" granted to city officials raises danger of arbitrary application); *see also City of Lakewood v. Plain Dealer Publ. Co.*, 486 U.S. 750, 758–59, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (absence of express standards in licensing context raises dual threat of biased administration of policy and self-censorship by licensees). Therefore, "the more subjective the standard used, the more likely that the category will not meet the requirements of the first

amendment." *Cinevision*, 745 F.2d at 575; *see also Christ's Bride*, 148 F.3d at 251 (suppression of speech under defective standard requires closer scrutiny).

■ In addition to these factors, courts examine the selectivity with which the forum was open to particular forms of expression. In general, the more restrictive the criteria for admission and the more administrative control over access, the less likely a forum will be deemed public. *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (distinguishing the government's decision to "make[ ] its property generally available to a certain class of speakers [from a situation] when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' to use it") (internal quotations and citation omitted); *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 570 (9th Cir.1984) ("[B]y granting [a private promoter] access to the [municipal amphitheater] for the presentation of music by a variety of performers, the City transformed publicly owned property into a public forum for expressive activity, even if the expressive activity is promoted by a single entity.").

■ Finally, courts consider whether the expressive activity is consistent with the principal function of the forum. *Cornelius*, 473 U.S. at 804, 105 S.Ct. 3439. This inquiry focuses on the specific space to which the would-be speaker seeks access, but should also take into account the context of the property as a whole. *DiLoreto*, 196 F.3d at 968.

■ It is undisputed that Pasco opened its display space to expressive activity by retaining the Arts Council to manage a gallery with exhibitions by local artists. This evinces an intent to create a designated public forum. Pasco argues, however, that its stated policy-memorialized in the agreement with the Arts Coun-

cil-demonstrates that it did not intend to establish a public forum, but only to display noncontroversial art. Put otherwise, the city contends that it opened only a limited (rather than a designated) public forum. This argument is unpersuasive.

The city's so-called policy of non-controversy became no policy at all because it was not consistently enforced and because it lacked any definite standards. Prior to the exclusion of the works at issue here, the city neither pre-screened submitted works, nor exercised its asserted right to exclude works. Indeed, controversial artwork was exhibited despite complaints from citizens and employees. Given the undisputed facts in the record concerning the selection and screening process for art to be displayed at City Hall (or, rather, the lack thereof), we conclude that the city retained no substantive control over the content of the arts program. Both Luhrs and Crutchfield testified that they left content screening to the Arts Council, and Luhrs' letter to Gurth confirms that he expected her to ensure the propriety of the exhibits. The record is clear that the Arts Council itself undertook no screening and, that it affirmatively solicited the purportedly controversial works at issue here. Combined with the fact that the city established no specific criteria for exclusion of art from the program, we are bound to conclude that the city opened its halls to expressive activity and thereby created a designated public forum in the art gallery. Because the city's decision to exclude the works by Hooper and Rupp was unjustified by any compelling state interest (a subject discussed more fully at section III(a)(3) *infra* ), we conclude that the district court erred in granting summary judgment to Pasco.

Turning to the artists' cross-motion for partial summary judgment, we are obliged to view the evidence in the light most favorable to the city. We must therefore assume that, as a matter of policy, Pasco expressly retained a "final say," or discretion to exclude "controversial" works, and

that, at least at the outset, Crutchfield and Luhrs intended the exhibit to be limited to uncontroversial works (whatever that may mean). Pasco argues that this proves that it did not intend to create a public forum, or alternatively, that any forum created was expressly limited to uncontroversial art.[10] Under the authorities discussed above, however, Pasco cannot hide behind its "policy" if that policy is inconsistent with the city's actual practice. Under the facts presented, we find inconsistency as a matter of law.

Certain facts are undisputed. First, the city concedes that it exerted little or no substantive control over the selection and content of the art work displayed at City Hall. The arts program was open to art work of any form, and there was no pre-screening of exhibits prior to Hopper's submission. Therefore, the basic structure of Pasco's arts program suggests an intent to permit unrestricted expression. Second, despite its stated policy of avoiding "controversial art," Pasco never established criteria by which to assess whether or not a work would fall within the policy. Instead, application of the policy was left

entirely to the discretion of city administrators.

The potential for abuse of such unbounded discretion is heightened by the inherently subjective nature of the standard itself.[11] A ban on "controversial art" may all too easily lend itself to viewpoint discrimination, á practice forbidden even in limited public fora.[12] *See Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (describing the inability of government officials to make principled distinctions on matters of taste and warning that censorship on this basis offers "a convenient guise for banning the expression of unpopular views"); *Hustler Magazine v. Falwell,* 485 U.S. 46, 55, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (permitting civil liability for "outrageous" social commentary invites viewpoint discrimination); *see also Federal Communications Comm. v. Pacifica Foundation,* 438 U.S. 726, 745–46, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it . . . . government must remain neutral in the marketplace of ideas."). Not only was Pasco's policy intrinsically flawed, its enforcement of the policy was,

---

10. Similarly, the dissent claims that we downplay the significance of the "intent" requirement in *Cornelius.* But the dissent's focus on outstanding factual issues and the need to focus on "intent" ignores the actual language of Rule 56(c), which precludes summary judgment where there is a dispute over *"material* fact[s]" (emphasis added). Having created the designated public forum, no trial is needed to determine what might have been when we have before us undisputed facts as to what actually occurred.

Contrary to any suggestion that we are weighing evidence, the *undisputed* evidence is that once Pasco created this forum, the city was inconsistent with respect to pre-screening, even as to *who* would conduct such pre-screening. Such an inconsistent policy is no policy at all for the purposes of forum analysis.

11. Pasco's policy against "offensive or politically motivated" art appears at least as subjective as the policies criticized in the cases cited above. *Cf. Mergens,* 496 U.S. at 244, 110 S.Ct. 2356 (after hours school access

barred to "noncurriculum related" student groups); *Putnam,* 221 F.3d at 845 (eligibility for links to the city's website restricted to websites "promot[ing] the city's tourism, industry and economic welfare"); *Cinevision,* 745 F.2d at 573 (ban on "hard rock" concerts); *Gregoire,* 907 F.2d at 1374 (school access limited to "civic" or education-related groups).

12. By definition, that which is "controversial" is "a cause of disagreement," or subject to opposing views. Webster's Third New Int'l Dictionary, p. 1366. Whether or not a given work causes such disagreement may hinge on the particular viewpoint an art piece is deemed to espouse as much as the manner in which that view is expressed. Widely accepted views will be much less likely to spark controversy than expressions of the opposing (minority) view. Works that represent conventional wisdom may not be perceived as conveying a viewpoint at all. For example, where the "Starving Man" sculpture was criticized as sending a bad message, one suspects a statue of a "well-fed man" would not be.

in practice, contingent upon the subjective reaction of viewers of the artwork, as perceived by the city management.[13] Such "censorship by public opinion" only adds to the risk of constitutional impropriety. *Cf. Texas v. Johnson,* 491 U.S. 397, 408–409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (invalidating ban on flag-burning where offense hinges on audience reaction).

This is not to say that community standards of decency have no place in the regulation of government property; our cases merely insist that such standards be reduced to objective criteria set out in advance. In the absence of such guideposts, we must scrutinize Pasco's actual practice all the more closely for apparent inconsistency or abuse in enforcing the policy.

A review of the art work displayed during Pasco's short-lived series of exhibits demonstrates that the concerns articulated in the preceding paragraphs are by no means hypothetical. It is undisputed that works involving nudity were displayed in earlier exhibitions without apparent negative comment. Pasco's *post-hoc* distinction between the "abstracted" depictions of nudity in these works and the perceived "sexual" nature of Hopper and Rupp's submissions does not erase the suspicion that a double-standard might have been applied. *Cf. Lakewood,* 486 U.S. at 758, 108 S.Ct. 2138 (discussing the potential for administrators to concoct *post-hoc* rationalizations for inconsistent treatment in the absence of substantive standards).

Such suspicion is brought into sharp relief by the city's handling of the "Starving Man" sculpture. It is undisputed that this work actually *did* generate negative feedback and, thus, would appear to fall, at least *prima facie,* within the terms of the prohibition on "controversial" art work.[14] Both the city and dissent cite testimony that the controversy surrounding the "Starving Man" sculpture never rose to the level created by the work of Hopper and Rupp and thus cannot be taken as evidence of any genuine inconsistency in Pasco's enforcement of its policy. Given the posture of summary judgment, we must accept such testimony unchallenged. Even so, Pasco has failed to articulate any basis to validate its asserted distinction in the degree of "controversialness" separating the respective art work other than the entirely subjective and ad hoc reactions of the limited subset of viewers whose opinions came to the attention of city administrators. To remand for trial of this issue under such a standard would only yield a verdict as arbitrary as the standard itself. Moreover, to sanction the suppression of speech on this basis would be to abdicate meaningful judicial review. *See id.* (without express standards, "the use of shifting or illegitimate criteria are far too easy.").

Having effectively opened its doors to all comers, subject only a standardless standard, Pasco has failed to exercise the clear and consistent control over the exhibits in city hall that our cases require to maintain a limited public forum. Its stated policy is belied by "objective indicia" of a contrary intent. *Paulsen v. County of Nassau,* 925 F.2d 65, 70 (2d Cir.1991).[15]

13. The city does not appear to have affirmatively solicited any feedback on the art work it displayed prior to Hopper's submission. Therefore, its assessment of viewers' reactions would have been based solely on opinions volunteered, a sample pool likely weighted toward those voicing complaints.

14. In addition, the political overtones suggested by the sculpture's title and subject matter provide a second basis for its possible exclusion.

15. The dissent's characterization of the Gallery as a "short-lived experiment" understates the significance of the actions taken by Pasco and the Arts Council in arranging the showings. The agreements with the artists featured extensive documentation, formal written contracts, prior discussion, and arrangement for display space in City Hall. The Gallery ran three separate exhibits. The dissent's efforts to shoehorn these exhibits into an "experimental" status does not counsel for a different First Amendment standard.

Other factors considered by courts in designated public forum analysis also favor the artists here. Unlike cases involving commercial speech, the purpose of the exhibitions here was purely aesthetic and expressive—the city hoped to promote and display the work of local artists as a means of beautifying the new city hall. Moreover, the nature of the property is consistent with the expressive activity at issue here. The city created the exhibition program and invited the participation of local artists because it hoped to increase the aesthetic appeal of the new city hall *by adding art*. Although there is some evidence that unrestricted artist expression could be deemed inappropriate for certain users of city hall, the dissent concedes that "there is no evidence that the displays, even if controversial, would have directly affected the running of the city government." Nor is this a case involving advertising or commercial speech, where the government is engaged in commerce and where allowing certain expressive activity might harm advertising sales or tarnish business reputation. *See Lehman,* 418 U.S. at 303–04, 94 S.Ct. 2714; *Children of the Rosary,* 154 F.3d at 977–78.

For these reasons, with respect to the artists' motion for cross summary judgment, we hold that the city created a public forum, specifically a designated public forum, in the art displays.

### 3. *Strict Scrutiny*

Having determined that the city created a designated public forum, we now consider whether the city's reasons for excluding the artists' work can survive strict scrutiny. *See Perry,* 460 U.S. at 45–46, 103 S.Ct. 948 (In a public forum, "the rights of the State to limit expressive activity are sharply circumscribed.... For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.") (citation omitted); *DiLoreto,* 196 F.3d at 964–65. The city insists that the

works by Hopper and Rupp "were simply the right thing in the wrong place." (quoting Justice Sutherland in *Euclid v. Ambler Realty Co.,* 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926), for the proposition that "[a] nuisance may be merely the right thing in the wrong place, like a pig in the parlor instead of the barnyard"). What made the City Hall Gallery the wrong place, the city contends, is the presence of employees, children, and citizens seeking to conduct their business with the city— and, of course, the city's content-based conclusion that plaintiffs' works were political, sexual, and controversial. The city steadfastly maintains that its exclusion of plaintiffs' works was not "censorship" since Hopper and Rupp "have been free to show their art throughout the City, *other than [at] city hall.*" The art, in Pasco's view, was merely ejected from the parlor, not thrown off the farm. But relegating the art to the barnyard does not pass First Amendment scrutiny.

We do not endorse Pasco's cramped view of what constitutes censorship, and we find none of the city's reasons for excluding the art work compelling. Although children may pass through the hallways of the building, the city concedes that the works are not obscene, and it is beyond peradventure that the works have serious artistic value. And the city offered no evidence to suggest that children would be harmed by, or even saw, the works. The mere fact that the works caused controversy is, of course, patently insufficient to justify their suppression. *See Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) ("If there is a bedrock principle of the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.") (citations omitted); *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 537–38, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980); *Cinevision,* 745 F.2d

**1082**

at 571.[16]

■ Finally, as we said in *Cinevision:* Although the City was not required to open the [property] and is not required to leave it open indefinitely, it cannot, absent a compelling government interest, open the forum to some and close it to others solely in order to suppress the content of protected expression. Generally, "[s]elective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone."

745 F.2d at 571 (footnote omitted) (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). As in *Cinevision,* Pasco's standard for disapproval of works in the exhibition ("controversialness") fails the narrow tailoring requirement because it "does not adequately limit the discretion of the [city] in approving or disapproving the proposals." *Id.* (citing *Board of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico,* 457 U.S. 853, 864–65, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) (plurality opinion)). Accordingly, we hold that Hopper and Rupp's First Amendment rights were violated by the exclusion of their works from the Pasco City Hall Gallery.[17] The district court erred in denying their cross-motion for partial summary judgment.

■ This result is, in certain ways, an unfortunate one. We recognize that city administrators set out to display art, not to censor it-although in the end, censorship prevailed. We also acknowledge that they walked a fine line as they tried to please the City Council, city workers, the local arts community, and the public at large, all of whom likely had different views as to what constituted art· "appropriate" for City Hall. But while Pasco may have blundered

into the controversy that ended its arts program, it could have avoided this problem by establishing and enforcing a clearly articulated policy that would pass First Amendment muster. Contrary to the dissent's assertion that our decision here "will discourage cities from experimenting with public art displays,"our analysis in no way precludes such city programs administered in a consistent and clearly articulated manner. But the fact that the city was well intentioned and acted in good faith does not excuse its violation of the artists' First Amendment rights.

**B. Municipal Liability**

■ Our analysis does not end with the conclusion that there was a First Amendment violation. The city can only be held liable if the acts in question were undertaken pursuant to official policy or custom. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The city has maintained that there are genuine issues as to whether Crutchfield was a final policymaker within the meaning of *Monell.* The district court discussed the issue briefly, but decided not to reach the merits because it perceived no underlying First Amendment violation. We, too, decline to reach this issue given the outstanding factual dispute about Crutchfield's role.

In *Monell,* the Supreme Court held that 42 U.S.C. § 1983 applies to municipalities and other local government units, *see* 436 U.S. at 690, 98 S.Ct. 2018, but noted that a municipality may *not* be held liable on a respondeat superior theory for the unconstitutional acts of its employees. Rather, municipal liability springs from an impermissible policy or practice:

> [A] local government may not be sued under § 1983 for an injury inflicted sole-

---

**16.** Given the location and small size of the banned works, we find no merit in the city's theory that children and/or city employees were a captive audience. *See Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); *cf. Lehman,* 418 U.S. at 307–08, 94 S.Ct. 2714 (Douglas, J., concur-

ring) (distinguishing between expression one can avoid if one so chooses and unavoidable expression).

**17.** Under this analysis, we need not reach the question of viewpoint discrimination.

ly by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be fairly said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. 2018; *see also Gillette v. Delmore,* 979 F.2d 1342, 1346 (9th Cir. 1992) (the *Monell* Court "made clear that the municipality itself must cause the constitutional deprivation and that a city may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior") (citing *Monell* and *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The requirement that action be taken pursuant to an official policy or custom arises from the Court's recognition that "Congress did not intend municipalities to be held liable unless action pursuant to official policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691, 98 S.Ct. 2018; *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("vicarious liability would be incompatible with the causation requirement set out on the face of § 1983").[18]

As we have noted, there are three ways to meet *Monell*'s policy or custom requirement:

> First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal government policy or a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (internal quotation omitted).... Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with "final policy-

making authority" and that the challenged action itself thus constituted an act of official government policy. *See Pembaur,* 475 U.S. at 480–81, 106 S.Ct. 1292; *McKinley v. City of Eloy,* 705 F.2d 1110, 1116 (9th Cir.1983)....
> Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it. *See Praprotnik,* 485 U.S. at 127, 108 S.Ct. 915; *Hammond v. County of Madera,* 859 F.2d 797, 801–02 (9th Cir. 1988).

*Gillette,* 979 F.2d at 1346–47.

Here, because the art program was not the product of any formal policy or longstanding practice, Hopper and Rupp must either show that the city manager was a final policymaker with respect to the arts program or that the city council ratified his decision to exclude the works. Because there are material facts in dispute as to this issue, we remand to the district court for resolution of *Monell* liability.

## IV. CONCLUSION

We REVERSE the grant of summary judgment to Pasco, REVERSE the district court's denial of Hopper and Rupp's cross-motion for partial summary judgment on the question whether Pasco violated their First Amendment rights, and REMAND for adjudication of the municipal liability issue. The district court is further directed to resume jurisdiction over the breach of contract claim against the Arts Council.

**REVERSED AND REMANDED.**

RONALD M. GOULD, Circuit Judge, concurring in part and dissenting in part:

This case presents the question whether the City of Pasco, Washington ("Pasco") violated the First Amendment when it invited local artists to display their work in

---

**18.** This is not to say that municipal liability is precluded where the case involves a single decision by a policymaker—an action taken only once as opposed to a repeated course of conduct. As the Supreme Court held in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), an individual decision by a city's "authorized decisionmaker ... surely represents an act of official government policy."

its new city hall and then refused to permit certain pieces of art to be placed or remain on display after the art provoked controversy. I concur in the reversal of the award of summary judgment to Pasco, but dissent from the award of partial summary judgment to the artists based on the majority's conclusion that Pasco created a designated public forum. I respectfully dissent because factual issues of Pasco's intent remain, United States Supreme Court precedent dictates a different rule regarding the creation of a designated public forum in light of the summary judgment standard, and the Ninth Circuit should wait for development of a full factual record before creating a new rule. I also dissent because the majority's ruling is unfair to and unworkable for cities within the Ninth Circuit and likely will discourage cities from experimenting with public art displays, which ultimately will be more harmful for artists than permitting Pasco to have its day in court.

## I

In 1994, Pasco remodeled a former school building and converted it into a new city hall. In an effort to decorate the bare walls of the new space, Gary Crutchfield, the City Manager, and his administrative assistant, Kurt Luhrs, decided to institute an experimental program whereby local artists would be invited to display their work in the newly remodeled building. Because Crutchfield did not want city employees to devote time and energy administering this program, Luhrs sought assistance from the Arts Council of Mid-Columbia Region ("the Arts Council"), a private entity that promoted the arts. Luhrs' primary contact at the Arts Council was its director, Barbara Gurth. Luhrs and Gurth agreed that the Arts Council would locate the art and administer the program in exchange for a $500 quarterly fee.

During initial discussions, Luhrs made clear to Gurth that Pasco was concerned about generating controversy: He instructed her that, in selecting art for the program, work of a "questionable nature"

should not be displayed. In a letter to Gurth, he described Pasco's concerns about this experimental program:

> During our conversation I got the impression that your board felt that our approach may not be a commitment to the long term management of such a project. This is far from the case. Both Gary and I feel that this approach will ensure support when I bring this item to council in a public meeting. Personally, my greatest fear is bringing such a program to council and having various citizens with a conservative "bent" raise issues that have caused trouble for the National Endowment of the Arts, i.e. offensive or politically motivated art. Through our discussions, I feel assured that the Arts Council will not use the City Hall Gallery as a venue for controversy. Nevertheless, without a demonstration, I feel that the unfounded fears of a few citizens would ruin this great opportunity for introducing the arts to our citizens.

Consistent with Pasco's concerns and shortly after announcing the project, Gurth sent a letter to artists who had expressed interest in the project and warned of the need to avoid controversial subject matter:

> Subject matter: Wide open, but with the restraints that would be expected with a public arts project paid for with public money. To offer a quote from a city official's letter regarding this project "... my greatest fear is ... having various citizens ... raise issues that have caused trouble for the National Endowment for the Arts, i.e., offensive or politically motivated art. Through our discussions, I feel assured that the Arts Council will not use the City Hall Gallery as a venue for controversy."
>
> Indeed, the Arts Council will not. I have worked for five years to bring the cities on board for the arts, and I will not jeopardize our progress. Additionally, I do not think that regional art in this area presents a problem in this

regard, *but* the Council will reserve the right to reject subject matter that the committee feels may present a problem for a conservative public sector. As an art historian whose major is in post-WW II American Art, this is an enormous compromise for me, but as an arts administrator motivated by the belief that the arts are necessary to the construction of a well balanced society, I realize compromise is necessary. Rejection of a particular piece should not, therefore, be construed by an exhibiting artist as censorship, but as a means of compromise to encourage public partnerships for arts action.

Thus, in announcing the program to the arts community, Gurth suggested that controversy would destroy the project and that artists submitting work could expect to be censored if their work was controversial.

There is, however, ambiguous and contradictory evidence about who would take responsibility for screening submitted artwork. Gurth's announcement letter suggested Arts Council responsibility ("the Council will reserve the right to reject subject matter that the committee feels may present a problem for a conservative public sector"). City Manager Crutchfield also understood that the Arts Council would screen works for suitability, testifying that the "Arts Council would do everything." Similarly, Crutchfield's assistant Luhrs testified that Pasco had no expertise in art and that the Arts Council should ensure that artists presenting political or offensive art would not be invited to participate. On the other hand, after the onset of this litigation, Gurth testified that she believed Pasco—not the Arts Council—would be responsible for screening. She said that the Arts Council viewed itself as a "middleman" and although it planned to convene a screening committee if the program became permanent, it did not intend to do so, and did not do so, in the initial stage. More specifically, she testified:

Mr. Luhrs did express a concern on the telephone that work of a questionable nature not be submitted and I assured him that I didn't think that was a problem. This was not a progressive area, where the visual arts are concerned, and it's made up mainly of landscape and flower painters, and there had never been a question about work being questionable in its content. So I assured him I didn't think it would be a problem, but that they [Pasco] would have to make that judgment.

On cross-examination, however, Gurth conceded that she may have agreed with Luhrs that "[w]e would both probably have a hand" in content control.

The course of events of the short-lived experiment is not entirely clear. The exhibits were scheduled to run three months at a time. The first exhibit ran from August through October 1995 and the second ran from November 1995 through January 1996. There is no evidence that either Pasco or the Arts Council screened the artwork before its display in these two exhibits. Although some individuals criticized a few pieces, there is no evidence that Pasco or the Arts Council prevented the display of any work or that they removed any work from display in response to public complaints.

The art displayed during these two exhibits generated very little controversy. Some works depicted nudity, but Gurth testified these were "abstracted" and nothing in the record indicates that they caused a genuine controversy. The record indicates, however, some controversy surrounding a sculpture known as "The Starving Man." Gurth testified, "from the very first exhibit, some people wanted one of the works removed. It was a clothed figure.... The figure was [a] life-size ceramic figure, and he called it 'The Starving Man.'" When asked about this criticism, Gurth testified: "It didn't send a good message, a starving man." But she also testified that there was never any serious discussion about removing it. Apart from "The Starving Man," the first two exhibits were uneventful.

Appellants Hopper and Rupp were invited to participate in the third exhibit, scheduled to run from February through April 1996. Luhrs testified that before the third exhibit, Gurth called to tell him she had not reviewed Hopper's work because she was out of town and that Luhrs might want to "check it out." This call prompted Luhrs to review Hopper's pieces when they arrived, although he had not reviewed any previous submissions. Gurth denied this telephone conversation took place. In any event, when Hopper submitted prints showing a naked couple in varied scenes, Crutchfield and Luhrs refused to hang the prints.

Rupp submitted a sculpture titled "To the Democrats, Republicans, and Bipartisans," which depicted a woman's bare buttocks "mooning" the viewer. Although Crutchfield and Luhrs initially permitted Rupp's piece to be displayed, complaints ultimately prompted Crutchfield to direct its removal.

Hopper and Rupp sued both Pasco and the Arts Council asserting, *inter alia*, a cause of action against Pasco under 42 U.S.C. § 1983 for the alleged violation of the First Amendment. Hopper and Rupp sought declaratory and injunctive relief, damages, and attorney's fees. On cross-motions for summary judgment, the district court ruled for Pasco and against Hopper and Rupp. This appeal followed.

## II

In *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court adopted a "forum analysis" framework for determining when restrictions of speech on government property are permissible. Within this framework, the Court recognized three types of forums: traditional, designated, and non-public. *Id.* at 45–46, 103 S.Ct. 948.

There is no question that Pasco's city hall is not a traditional public forum. Instead, as the majority correctly recognizes, resolution of the dispute in this case turns largely on whether Pasco converted its city hall from a non-public forum, where it would have relatively broad power to regulate expression, into a designated public forum, where its constitutional ability to regulate speech would be strictly limited. More specifically, we are not dealing here with an attempt by Pasco to censor or preclude the showing of artwork by Hopper, Rupp, or any other artist in traditional public forums. Nor are we concerned with an attempt generally to preclude the showing of "controversial" artwork at all or selected locations within Pasco city limits. Instead, this case is about Pasco's right to regulate expression in a space that normally is not a public forum and that can become a public forum *only* through Pasco's intentional action creating one. "[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *United States Postal Service v. Council of Greenburgh Civic Ass'ns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).

The key to whether the government has created a designated public forum is governmental intent. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). The Supreme Court has identified three primary factors to consider in determining whether the government intended to create a designated public forum: (1) what the government said; (2) what the government did; and (3) the compatibility of the space with the expression.

> The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse. Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum. The Court has also examined the nature of the property and its compatibility with expressive activity to discern the government's intent.

*Id.* at 802, 105 S.Ct. 3439 (citing *Perry,* 460 U.S. at 47, 103 S.Ct. 948) (internal citations omitted). We must consider these factors to determine whether they "indicate an intent to designate a public forum dedicated to expressive activities." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.,* 196 F.3d 958, 965 (9th Cir.1999). This is precisely where, in my view, the majority goes astray as it does not consider each of the *Cornelius* factors in light of the correct summary judgment standard.

In ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper only if there is "no genuine issue as to any material fact." *Id.* at 258, 106 S.Ct. 2505. A "genuine issue" exists, precluding summary judgment, as long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249, 106 S.Ct. 2505 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

In light of these cautionary and salutary principles, summary judgment for *either* party is inappropriate because the three *Cornelius* factors support reasonable inferences in favor of either party on the issue of Pasco's intent to create a designated public forum.

### III

If the evidence is viewed in the light most favorable to Hopper and Rupp, the non-moving parties with respect to Pasco's motion for summary judgment, and if all permissible inferences are drawn in their favor, there is no question the district court erred in granting Pasco summary judgment based on the finding that the city hall was a non-public forum. To this extent, I agree with the majority's analysis.

Pasco's initial communications with the Arts Council indicated a concern to avoid controversial subject matter. Viewing the evidence in the light most favorable to Hopper and Rupp, however, Pasco's conduct does not reflect its expressed intent. Before the incidents with Hopper and Rupp, neither Pasco nor the Art's Council pre-screened the artwork. Evidently all submitted art was displayed. Although some art generated a small degree of controversy and was arguably political (e.g., the "Starving Man"), Pasco made no effort to remove any art. The "City Hall Art Gallery" was located in the lobby of city hall, which a reasonable juror might perceive to be a natural place for the display of all types of art if all inferences are given the artists. Moreover, there is no evidence that the displays, even if controversial, would have directly affected the running of the city government. *Cf. Cornelius,* 473 U.S. at 792, 105 S.Ct. 3439 (before regulations "the increasing number of entities seeking access to federal buildings and the multiplicity of appeals disrupted the work environment and confused employees who were unfamiliar with the groups seeking contributions").

Viewing this evidence in the light most favorable to Hopper and Rupp, a reasonable juror could conclude that even if Pasco initially intended to permit display only of selected, non-controversial art, it abandoned that intent. Similarly, in this light, the nature of the space and Pasco's conduct could support the conclusion that Pasco intended to open its city hall to the unrestricted display of art.

The district court assumed the role of trier of fact when it concluded that Pasco's stated policy trumped *any* reasonable inferences that might be drawn from Pasco's actual practice or from the nature of the space. This was error and, as the majori-

ty correctly determines, summary judgment for Pasco must be reversed. *See Liberty Lobby*, 477 U.S. at 250–51, 106 S.Ct. 2505.

## IV

I respectfully disagree, however, with the majority's further holding that Hopper and Rupp are entitled to partial summary judgment. We must view the evidence in the light most favorable to *Pasco* when considering Hopper and Rupp's cross-motion for summary judgment. Viewing the evidence in this light, a reasonable juror could find that Pasco did not intend to open its city hall as a public forum.

It is undisputed that Pasco's stated intent at the outset of the experimental project was *not* to open its city hall to unrestricted or indiscriminate artistic activity. Viewed in the light most favorable to Pasco, this undisputed evidence and reasonable inferences therefrom alone are sufficient to preclude a partial summary judgment for Hopper and Rupp on the public forum and free speech issues. To grant summary judgment to Hopper and Rupp in light of this evidence of Pasco's intent, we must either: (1) weigh this important evidence and determine it counts for nothing; (2) conclude that Pasco did not mean what it said; or (3) conclude that Pasco meant what it said but later changed its mind. However, we may not weigh and interpret evidence because this is a function solely reserved for the trier of fact.

Reasonable inferences that a trier of fact may draw from the nature of the space also preclude granting partial summary judgment to Hopper and Rupp. Both Pasco and the Arts Council expressed concern that continued funding might be jeopardized by a display of art that generated controversy. Luhrs' letter to the Arts Council stated: "my greatest fear is bringing such a program to council and having various citizens with a conservative 'bent' raise issues that have caused trouble for the National Endowment of the Arts, i.e. offensive or politically motivated art." In response, Gurth's announcement letter

noted: "I have worked for five years to bring the cities on board for the arts, and I will not jeopardize our progress." Viewing these statements in the light most favorable to Pasco, a trier of fact could reasonably conclude that the space was not, in fact, compatible with an open public forum.

Similarly, Pasco's conduct was not unambiguous and does not necessarily support the inference that Pasco intended to create a designated public forum. Even assuming that Pasco did not perform any screening until it encountered Hopper's and Rupp's pieces, this does not compel the conclusion that Pasco intended to create a designated public forum. A reasonable juror, viewing the evidence in the light most favorable to Pasco, could conclude that any lack of screening was the result not of a conscious plan, but of inaction caused by inadvertence or a breakdown in communications. While Pasco thought the Arts Council was screening the artwork to avoid controversial material, the Arts Council believed it was a middleman subject to Pasco's final determination to exclude objectionable work. As *Cornelius* makes clear, "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." 473 U.S. at 802, 105 S.Ct. 3439.

Similarly, a reasonable juror could conclude that the brief experimental period before Pasco excluded Hopper's and Rupp's works is too short, and the record too sparse, to show any unambiguous intent to open the forum. Viewing the evidence in the light most favorable to Pasco, there was no substantial controversy before the controversy regarding Hopper's and Rupp's pieces. As noted above, the earlier abstracted nudes generated virtually no comment. And although the "Starving Man" piece generated some dispute, Gurth testified:

Question: Did you have a discussion about removing it, a serious discussion?
Answer: No, it didn't escalate to that point. I simply alerted the artist that it

may happen, and we were prepared to take it out if Pasco insisted. And so the artist said that was fine by him. He had no qualms with it, it would only enhance his reputation.

Viewing this evidence in the light most favorable to Pasco, a reasonable juror could infer *not* that Pasco failed consistently to enforce a policy of excluding controversial art, but that before encountering Hopper's and Rupp's pieces, Pasco never faced occasion or need to enforce the policy. The majority's conclusion that Hopper and Rupp are entitled to summary judgment depends on its weighing of these conflicting inferences—a function properly reserved for the trier of fact.

## V

I respectfully do not agree with the majority's reliance on *Christ's Bride, Planned Parenthood, Grace Bible,* and *United Food* to grant summary judgment to Hopper and Rupp. When fully examined, these cases highlight the ambiguity of the evidence in this case as well as the need for a full trial to develop an adequate record.

In *Christ's Bride Ministries, Inc. v. SEPTA,* 148 F.3d 242, 244 (3rd Cir.1998), *cert. denied,* 525 U.S. 1068, 119 S.Ct. 797, 142 L.Ed.2d 659 (1999), the Third Circuit reviewed the decision of the Regional Transit Authority ("RTA") to remove a poster from a bus submitted by an anti-abortion group, which stated "Women Who Choose Abortion Suffer More & Deadlier Breast Cancer." There, *following a bench trial* the district court found that the Transit Authority had not created a public forum and accordingly could permissibly remove the poster. *Id.* The Third Circuit, having the benefit of a full record before it, reversed. The court noted that the RTA had a long practice of accepting numerous ads on a wide range of topics, including religious and political messages, explicit ads regarding safe sex, abstinence and AIDS, and ads in favor of abortion rights.

Of the many such controversial advertisements submitted, the RTA rejected or requested modification of only three—none of which related to abortion. *Id.* at 251–52. The Third Circuit thus concluded that the RTA's practice of permitting numerous controversial advertisements and several abortion-related advertisements indicated an intent to create a public forum for the display of material relating to abortion. *Id.* at 252. Moreover, the court found that the RTA's stated policy also supported the inference that it intended to create a public forum because the policy did not provide for the type of limitations on speech reflected by the removal of the anti-abortion poster. *Id.*

Here, in stark contrast, there is no record of a long practice allowing controversial artwork. During the experimental period, there was only a scintilla of evidence suggesting some inchoate controversy surrounding one piece[1] and no evidence of any serious controversy. We cannot correctly conclude as a matter of law that Pasco had a consistent practice of permitting controversial artwork. In the short time the project proceeded, Pasco was faced with few instances of even arguably controversial art. And unlike *Christ's Bride,* Pasco's stated policy is not consistent with an intent to create a designated public forum. *Christ's Bride* does not support the majority's conclusion that Hopper and Rupp are entitled to partial summary judgment rather than a trial.

Similarly, neither *Planned Parenthood Ass'n v. Chicago Transit Auth.,* 767 F.2d 1225 (7th Cir.1985), nor *Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. # 5,* 941 F.2d 45 (1st Cir.1991), supports the proposition that summary judgment is appropriate where intent to create a designated public forum is ambiguous, as it is here. In *Planned Parenthood, following a bench trial* the district court found that the Chicago Transit Authority ("CTA") created a limited public forum on its buses

1. The sparse record does not contain any photograph, drawing or replica of this piece. The fact that the record is not sufficiently developed to determine the nature of any prior "controversy" further supports a remand for a trial on the merits.

and thus improperly excluded the plaintiff's abortion-related advertising. 767 F.2d at 1228. The district court found that the CTA's alleged policy of excluding certain material (such as the advertisement at issue) was contrived for the lawsuit and that over a ten-year period the CTA permitted a wide range of controversial advertising, including advertisements relating to abortion. *Id.* The only issue on appeal was whether these factual findings were clearly erroneous. *Id.* at 1228–29. Similarly, in *Grace Bible, following a bench trial* the district court found that the defendant school district created a designated public forum. 941 F.2d at 46–47. The First Circuit affirmed on the ground that the school district's written policies indicated an intent to open its facilities indiscriminately to the community, rather than to restrict access to school-related uses. *Id.* at 47–48. Further, the district's practice of allowing many organizations to use its facilities reflected this intent. *Id.*

Both *Planned Parenthood* and *Grace Bible* involved an extensive record of a past practice permitting the type of speech the government later sought to ban, which contradicted the government's claim that it limited access to its property. Both involved either an express policy demonstrating an intent to open the space or a post hoc policy contrived to conceal censorship. And in both cases a trial was conducted, the record fully developed, and factual determinations made at trial were controlling. Here, in contrast, the record of Pasco's past practice is barely existent and Pasco's express policy genuinely does not show an intent to create a designated public forum. And perhaps most importantly, neither party has had the opportunity to develop a full record at trial and key facts cannot properly be determined on this appeal.

*United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341 (6th Cir.1998), similarly does not support granting summary judgment for Hopper and Rupp. There, the Sixth Circuit relied on *Cornelius* and reasoned that "[w]e ... must close-

ly examine whether in practice [the transit authority] has consistently enforced its written policy in order to satisfy ourselves that [its] stated policy represents its actual policy." *Id.* at 353. Because the union did not identify any advertisements accepted by the transit authority that violated the written policy, the court noted "we have no reason based on the record at this time to believe [the transit authority] applies its written policy on an *ad hoc* basis." *Id.* However, the court observed "[s]hould [the union] introduce evidence at trial demonstrating that [the transit authority] has not consistently followed its written policy, but instead has maintained an *ad hoc* policy where the acceptability of an advertisement depends on the whim of the decisionmaker, this would strongly suggest that [the transit authority] has created a public forum." *Id.* at n. 6. As previously discussed, here there is no evidence demonstrating Pasco's inconsistent enforcement of its written policy because the experimental exhibitions generated little to no controversy with which to test its stated policy. *United Food* does not support the majority's use of a scant record to grant partial summary judgment to Hopper and Rupp on the public forum issue; instead, *United Food* supports remanding this issue for trial.

Certainly inconsistent enforcement of a policy may be evidence of governmental intent to create a designated public forum. And a jury instruction on the standards for determining intent might properly encourage consideration of this factor. If enforcement history is considered at a trial, and a trier of fact finds the history supports a determination of intent to create a designated public forum, this evidence may be properly credited by an appellate court. Notwithstanding, these principles do not justify the majority's approach of making an ambiguous enforcement practice—not considered by a trier of fact—the sole determining factor.

## VI

The Supreme Court instructs that governmental intent is the key to forum anal-

ysis because the government does not convert its property into a public forum absent an intent to do so. *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439; *see also General Media Communications, Inc. v. Cohen,* 131 F.3d 273, 279 (2d Cir.1997) (intent is "touchstone" of forum analysis); *Sentinel Communications Co. v. Watts,* 936 F.2d 1189, 1202 (11th Cir.1991) (same); *Gregoire v. Centennial Sch. Dist.,* 907 F.2d 1366, 1386 (3d Cir.1990) (same); *Stewart v. District of Columbia Armory Bd.,* 863 F.2d 1013, 1016 (D.C.Cir.1988) (same). It necessarily follows that whether a government entity intended to open a forum is an "inherently factual inquiry that should not be resolved without due attention to an underlying record." *Air Line Pilots Ass'n, Int'l v. Dept. of Aviation of the City of Chicago,* 45 F.3d 1144, 1152 (7th Cir.1995); *Stewart,* 863 F.2d at 1018. Where important constitutional issues turn on the outcome of the intent inquiry, summary judgment is likely to be inappropriate. *Searcey v. Crim,* 815 F.2d 1389, 1392–93 (11th Cir.1987) (summary judgment on issue of government intent to create limited public forum inappropriate); *May v. Evansville–Vanderburgh Sch. Corp.,* 787 F.2d 1105, 1115 (7th Cir.1986) (same); *see also, e.g., Perry v. Sindermann,* 408 U.S. 593, 598, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (where government's motive was element of § 1983 claim, summary judgment was improper).

Summary judgment almost certainly is inappropriate in a case such as this where intent is at issue. "In many constitutional and civil rights cases, a necessary element of the claim for relief presents an inquiry into the state of mind of one or more of the parties.... [C]laims requiring a determination regarding intentions or motives are particularly unsuitable for summary adjudication." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure, Civil* 2d § 2732.2 (1998). In fact, in a related context involving a plaintiff's claim that he had been fired for exercising his First Amendment rights, this court noted that "a fair resolution" of the issues of the employer's motive and intent—essential elements of the claim—"requires a full trial on the merits," and that those questions are "plainly ... reserved to the trier of fact." *Peacock v. Duval,* 694 F.2d 644, 646 (9th Cir.1982) (internal citations and quotations omitted).

Such is the case here. At best the record is incomplete and supports contrary inferences regarding Pasco's intent, thus precluding summary judgment for either party. A grant of partial summary judgment to Hopper and Rupp is inconsistent with the Supreme Court's teaching in *Liberty Lobby,* which bars a court from making factual determinations when the record supports conflicting inferences. "[A]t the summary judgment stage the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 242–43, 106 S.Ct. 2505.

A failure correctly to apply the *Cornelius* factors and the proper summary judgment standard to the key question of Pasco's intent is error.[2] The majority

---

2. The majority incorrectly assumes that a forum was created, and then argues that there is no genuine issue of material fact concerning Pasco's allegedly inconsistent screening policy. Majority Opinion at 1079 n. 10. With respect, the majority misses the point. There is a genuine issue of material fact on Pasco's intent. This requires trial to determine if a limited public forum was ever created. As United States Supreme Court and other authority make clear, intent, and not enforcement policy, is the touchstone of forum analysis. The majority's analysis infers that the "structure of Pasco's arts program suggests an intent to permit unrestricted expression." Majority Opinion at 1079. It is a stretch for the majority to conclude that the structure of the program proves that Pasco's intent is unmistakably different from what Pasco stated in its letters. This requires the majority to draw several inferences adverse to Pasco. Perhaps this can be argued, but when all inferences properly are given Pasco on summary judgment, there can be no doubt that Pasco's letters and statements show that there is a genuine issue of material fact regarding its intent. It is puzzling that the

in effect creates a new per se rule that the government's failure systematically to enforce an exclusionary policy—without regard to whether there was even an appropriate occasion to enforce such policy—conclusively establishes that it has created a designated public forum. This new rule conflicts with the Supreme Court's admonishment in *Perry* and *Cornelius* that intent is the key to the public forum inquiry. It also contradicts the Supreme Court's instruction that a court must look to three factors to determine intent: the government's policy, the government's conduct, and the nature of the space. If reasonable inferences from these three factors support a jury finding that the government did not intend to open up a space for unrestricted expression, partial summary judgment for Hopper and Rupp is inappropriate. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. As demonstrated above, each of these factors support such a finding here. Pasco's intent is an open question and the issue should be submitted to a jury after a trial that fully develops the facts.

Moreover, the majority's new rule undermines important First Amendment interests. As the Supreme Court recently explained:

> The *Cornelius* distinction between general and selective access furthers First Amendment interests. By recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. That this distinction turns on governmental intent does not render it unprotective of speech. Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate

its property as a forum for specified classes of speakers.

*Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 680, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Faced with a rule that a government's ambiguous conduct alone can support a § 1983 action for damages for First Amendment violations, governments may see their choice as being the "all-or-nothing" choice described in *Forbes* and likely will then refuse to open the property at all. This result harms artists, governments, and the public alike.

It is not necessary to create a new rule that conflicts with Supreme Court precedent when we can instead remand for a trial and abide that precedent. For the foregoing reasons, I respectfully dissent.

---

majority mistakenly assumes the role of fact finder on the issue of intent, which courts almost universally view as a factual issue. The majority's reliance on snatches of language from cases that went to trial hardly

answers this objection. And under the Supreme Court's controlling precedents, a lack of consistent enforcement policy, properly viewed, is only one factor that the trier of fact may consider in assessing intent.