803 A.2d 679 (2002)
353 N.J. Super. 554
RUTGERS 1000 ALUMNI COUNCIL, an unincorporated organization, Plaintiff-Respondent,
v.
RUTGERS, The State University of New Jersey and William W. Owens, in his official capacity as Director of Marketing and Communications Services of Rutgers Magazine, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 16, 2002.
Decided August 2, 2002.
*681 Peter L. Skolnik argued the cause for appellants (Lowenstein Sandler, attorneys; Mr. Skolnik and Michael A. Norwick, on the brief).
Grayson Barber and J.C. Salyer argued the cause for respondent (Grayson Barber and American Civil Liberties Union of New Jersey Foundation, attorneys; Ms. Barber and Mr. Salyer, on the brief).
Hogan & Hartson, Drinker Biddle & Shanley and American Council of Education, attorneys for amici curiae American Council on Education, American Association of Community Colleges, American Association of State Colleges and Universities, Council for Advancement and Support of Education, and National Association of State Universities and Land-Grant Colleges (Martin Michaelson, John G. Roberts, Jr., Christopher T. Handman, Sheldon E. Steinbach, Stuart A. Law, Jr., and Brian J. Waters, of counsel and on the brief).
Before Judges WALLACE, JR., CARCHMAN and WELLS.
*680 The opinion of the court was delivered by CARCHMAN, J.A.D.
Plaintiff Rutgers 1000 Alumni Council, the alumni branch of the "Rutgers 1000," a group of students, alumni and faculty opposed to defendant Rutgers University's ("defendant" or "University") focus on Division I athletics and membership in the Big East Conference, submitted an advertisement to the Rutgers Magazine (the Magazine). The ad "invited inquiries" and provided a contact address. The Magazine rejected the ad citing its extant, but unwritten, policy against accepting "issueoriented" or "advocacy" ads.
Plaintiff challenged that rejection asserting that its First Amendment rights under the United States Constitution and free speech rights under the New Jersey Constitution were violated and that the Magazine engaged in viewpoint discrimination. The trial judge in the Chancery Division agreed and enjoined the Magazine from refusing to publish the advertisement. We now affirm and conclude that while the Magazine's stated policy of refusing issueoriented or advocacy ads is valid, the Magazine violated its own policy through the prior publication of what can reasonably be construed to be an issue-oriented or advocacy ad addressing that same subject-matter as plaintiff's ad. As such, defendant engaged in viewpoint discrimination, and plaintiff is entitled to injunctive relief mandating publication of its ad.

I.
To place this controversy in perspective and context, we present an expansive review *682 of the relevant facts, noting that they are not in substantial dispute. Plaintiff is an unincorporated association and the alumni branch of the "1000 Men & Women of Rutgers," also known as "Rutgers 1000," which consists of a "movement" of students, alumni and faculty opposed to defendant's focus on Division I college athletics and membership in the Big East Conference. Consisting of approximately 200 members, the Alumni Council, plaintiff here, was formed in 1998, and its primary spokesperson is Richard S. Seclow, a 1951 graduate of Rutgers College.
Plaintiff creates interest in the views of Rutgers 1000 by: (1) writing to newspaper editors, state legislators and university staff and faculty; (2) providing interviews to the press; (3) maintaining an Internet web site; and (4) placing advertisements in various publications. The primary engine for increasing its membership has been plaintiff's web site, which is maintained by the Rutgers 1000 Student Council and has attracted over 200,000 hits; however, plaintiff has no mechanism for targeting or contacting the entire University community or, more narrowly, the alumni.
In April 1998, plaintiff placed a full-page advertisement in the Daily Targum (Targum), the independently produced, Rutgers student newspaper. The ad featured Milton Friedman, a Nobel laureate, Rutgers alumnus and member of Rutgers 1000. Following publication of the ad in the Targum, plaintiff received a "fire storm" of press, and articles about Rutgers 1000 were written in the New York Times, Sports Illustrated, the Chronicle of Higher Education and several New Jersey newspapers as well as the Targum.
The Magazine, an official publication of defendant, is an award-winning quarterly periodical and has a circulation of approximately 105,000. It publishes articles on political, literary, historic, scientific, cultural and athletic issues and is distributed to alumni, faculty and staff, parents of students, non-alumni contributors and other non-university related individuals. Its masthead states that it is "For Alumni & Friends of New Jersey's State University."
Typically, the Magazine dedicated the back and inside covers, plus up to sixteen pages, to advertising and sold advertising to the public; advertisers were not restricted to alumni. All advertisements were paid for, even if the advertisers were departments within the University. Defendant William W. Owens, now retired, but then the Director of Marketing and Communications Services for defendant and Editorial Director of the Magazine, made the final decision on the Magazine's editorial content and possessed the authority to reject an advertisement.
In May 1998, plaintiff submitted a onecolumn advertisement to the Magazine. Plaintiff sought publication in the Magazine's Summer issue in order to appeal to alumni and to obtain more support for its cause. Plaintiff believed that the Magazine was the "only place where [it could] get the pure alumni audience." [1] The proposed *683 advertisement was entitled "For Rutgers Alumnia Time to Choose," and featured a photograph of Milton Friedman and quotation by him, stating: "Universities exist to transmit knowledge and understanding of ideas and values to students, not to provide entertainment for spectators or employment for athletes." The advertisement urged Rutgers to "withdraw from `professionalized' college athletics, resume competition at a genuinely collegiate level, and return to its values as an old and distinguished university." It solicited alumni to join plaintiff's campaign and provided a mailing address and an Internet web site.
The advertisement was forwarded to the Magazine's editor, Lori Chambers, who brought it to Owens' attention because she believed it violated the Magazine's policy against accepting issue-oriented ads. Owens examined the advertisement, concurred with Chambers and informed plaintiff that the advertisement was unacceptable because the Magazine did not sell space for "letters, opinion articles, or advocacy advertising of any sort."
On behalf of plaintiff, Seclow wrote to Owens, seeking a clarification of the Magazine's policy concerning advocacy advertising. Owens responded and wrote:

Rutgers Magazine is intended to promote Rutgers and its programs, and to engender loyalty and enthusiasm for the institution among the University community, friends of the University, and alumni. Through its advertisements, the magazine offers goods and services that might benefit and be of interest to that audience so long as the nature of the goods and services is not inconsistent with the magazine's limited purposes.
He further stated that the Magazine had never published any kind of "advocacy advertisement supporting one side or another in a matter of public controversy."
Owens explained that he considered "`advocacy' advertising on any subject to be inconsistent with the goals and purpose of the Magazine," and identified the matter of public controversy in plaintiff's advertisement to be the University's participation in the Big East Conference, that issue being plaintiff's "whole reason for being." He further explained that while he had used the word advocacy several times, it would be "more accurate" to say that the Magazine's policy "was to have only issue neutral ads and not to accept issue oriented ads."
Owens concluded that the advertisement was issue-oriented because plaintiff was an issue-oriented group, stating "it's very obvious and they're inviting people to join their group." The Magazine adopted such a policy because to accept issue-oriented advertisements would "open" them to a number of "critical and negative things from all kinds of groups thatthat we couldn't control" and expose the University to blame for "running controversial ads." Owens' information about plaintiff was based on the text of the proposed advertisement itself, the interview of Seclow that the Magazine conducted for an article about Robert Mulcahy, defendant's new athletic director, and from other articles about plaintiff that Owens had read.
The cover story of the Magazine's Summer 1998 issue focused on Mulcahy and Rutgers' athletic program (the Mulcahy article). As part of this article, Seclow *684 was interviewed, and plaintiff's position on the University's membership in the Big East was included because the Magazine felt that a "balanced" story on the issue should be presented. The article quoted Seclow, stating:
[C]ollege sports has gotten out of hand in this country, and Rutgers has been swept up in it. Why not take coaches' salaries and hire more professors or endow more scholarships for minority students? Big-time athletics leads to cutting corners and lowering academic standards. I think Bob [Mulcahy] is eventually going to find this out and make changes, or he'll find that the job isn't for him.
The subsequent Fall issue of the Magazine published four letters from readers in response to the Mulcahy article, including three supporting plaintiff's position. Also published in the "Alumni Notes" section of that issue was a class note from Seclow regarding plaintiff:
Dick Seclow may be retired from the advertising world, but he's far from inactive. Dick is a leader of the Rutgers 1000 Alumni Council which feels that the academic standing of the University is declining and wants Rutgers to withdraw from the Big East to join a less competitive conference like the Patriot League. They feel that money being spent on big-time athletics might be better spent in the academic area. Dick is interested in your input and he can be contacted at 44 Reading Road, Easton, CT 06612.
In October and November 1998, Seclow tried again to place an advertisement for plaintiff in the Magazine, this time submitting a classified advertisement for publication in the "Marketplace." The section contained the Magazine's classified ads, running advertisements for real estate, vacation properties, services and other miscellanea.[2] Seclow's proposed advertisement stated the following:
Rutgers 1000
Invites Inquiries
Rutgers 1000 Alumni Council
P.O. Box 172
Easton, CT 06612
On the Internet: Search Rutgers 1000
Through Yahoo
Owens rejected the ad stating that the Magazine was "unable to accept the advertisement you submitted" and reiterating:
As I wrote to you this summer, Rutgers Magazine is intended to promote Rutgers and its programs, and to engender loyalty and enthusiasm for the institution among the University community, friends of the University and alumni. Through its advertisements, the magazine offers goods and services that might benefit and be of interest to that audience so long as the nature of the goods and services is not inconsistent with the magazine's limited purposes. Past advertising practices of the magazine are consistent with these goals.
Owens explained that he considered the classified advertisement to be a form of advocacy because Rutgers 1000 was
pretty well-known after being in the Times and certainly on campus and [the Targum] and Sports Illustrated and other places as being an issue oriented group. And since we don't accept ads from issue oriented groups at all in any advertising in the magazine including Marketplace nor would we accept advertising from the N.R.A. inviting inquiries or Operation Rescue inviting inquiries or in abortion counseling information inviting inquiries. We just would not accept *685 them because they are controversial issues.
Owens further believed that the name of the group "instantly trigger[ed] an association with an issue." He acknowledged that he rejected the advertisement, not because of the advertisement itself, but because of information that he had received from other sources about plaintiff.
Owens' articulation of the Magazine's policy in his responses to plaintiff had never before been reduced to writing. He stated: "These policies we developed in our heads from dealing with the issues over and over again every day. We just know what the policies are from ... the constant exposure."
Defendants explained that three incidents in prior years had contributed to the formulation of this policy. First, approximately ten years ago, a political candidate sought to place an advertisement. The then-publisher discussed the matter with Owens, and the Magazine decided not to run the advertisement because it did not accept political or advocacy advertising. The second also occurred approximately ten years ago when a wealthy individual began placing ads in college newspapers disputing the Holocaust. The publisher and Owens discussed their policy against advocacy advertising as a basis for refusing the Holocaust advertisements; however, the Magazine was never asked to run the advertisement. Third, about five to eight years ago, during a meeting of the University Magazine Network, which is a consortium of ten magazines that jointly pursue national advertising, the network discussed whether to run political advertisements and voted to decline such ads. In addition, Owens explained that as a member of the University Magazine Network, the consortium turned down an advertisement from an electric utilities group promoting nuclear energy because the group was issue-oriented.
Owens also acknowledged that the Magazine had enforced its policy against issue advertisements only a handful of times, and that he had mentioned all the incidents that he could remember, but noted that the policy was enforced uniformly and consistently because each time the issue had arisen it had been "dealt with in the same way."
The Winter 1998 issue of the Magazine published a letter to the editor from Seclow, which mentioned plaintiff. The Magazine deleted the last paragraph of Seclow's letter because of its policy that letters to the editor must pertain to a story in the Magazine. The edited letter stated:
In your nine-page paean to new athletics director Robert Mulcahy, you referred to me as the alumni leader of Rutgers 1000. The leadership isn't in my hands. It's shared by an executive committee of six alumni who live in California, Texas and Connecticut, demonstrating the geographic representation of our members.
The headline on the cover of the Summer issue, "He's Got Game," is a knockoff of Spike Lee's latest film, He Got Game, which depicts the outrageous recruiting techniques by two universities for a talented high school basketball star. The coupling of the two stories is sadly revealing.
At trial, plaintiff focused on two advertisements that the Magazine had published in 1998 as examples of issue-oriented or advocacy ads. The first, placed by the Alumni Federation, featured a "Salute to Alumni Legislators in Trenton," and appealed to readers to let their elected representatives "know how you feel about decisions that affect Rutgers and higher education." Each legislator was identified by name, picture and political affiliation.
*686 Owens concluded that this was not an advocacy advertisement because it did not refer to any specific issues. He believed it was a factual ad that simply "celebrates" alumni accomplishments and urged the Magazine's readers "to be active." He acknowledged that he was not familiar with the Alumni Federation and whether it was an advocacy group, and that there was no formal process for determining whether a prospective advertiser was an issue-oriented group. Owens explained: "[I]t's pretty obvious when you see an ad or a request for an ad from an issue oriented group whatwhat's involved. There isn't much of a mystery involved."
The second and more significant advertisement featured the Big East basketball championship. It promoted defendant's basketball team as well as the Big East and its championship tournament to be played at Madison Square Garden. The two-page ad also included a letter from Mulcahy and offered readers an opportunity to purchase tickets.
Owens did not consider this to be an advocacy advertisement because it "simply sold tickets," which he considered "a good that basketball fans would be interested in." He did not think it involved the issue of whether the University should or should not be in the Big East Conference because the advertisement was "not saying that Rutgers should stay in the Big East or should have joined the Big East. It [was] simply encouraging people to buy tickets."
This litigation followed resulting in a mandatory injunction and an award of counsel fees.

II.
We first address our standard of review. Defendants argue, and we agree, that a de novo standard of review applies in this case involving the First Amendment.
Independent review of the record below is required because this case involves a First Amendment question. See Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502, 515 (1984) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-86, 84 S.Ct. 710, 728-29, 11 L.Ed.2d 686, 709 (1964)) (noting that the Supreme Court has "repeatedly held that an appellate court has an obligation to `make an independent examination of the whole record' in order to make sure that `the judgment does not constitute a forbidden intrusion on the field of free expression.'"). The holding reflects a "deeply held conviction that judges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution." Id. at 510-11, 104 S.Ct. at 1965, 80 L.Ed.2d at 523.
The Court added that the "simple fact is that First Amendment questions of `constitutional fact' compel this Court's de novo review."[3]Id. at 508 n. 27, 104 S.Ct. at 1964, 80 L.Ed.2d at 522; see also Adam Hoffman, Note, Corralling Constitutional Fact: De Novo Fact Review in the Federal Appellate Courts, 50 Duke L.J. 1427, 1463 (2001) (stating that several courts of appeals have concluded that all First Amendment questions are subject to plenary review). The New Jersey Supreme Court has adopted the same view that First Amendment cases require de novo review. In Ward v. Zelikovsky, 136 N.J. 516, 536-37, *687 643 A.2d 972 (1994), a slander case, the Court quoted Bose and New York Times v. Sullivan, stating that "we must `make an independent examination of the whole record,' to ensure that `the judgment does not constitute a forbidden intrusion on the field of free expression.'"
Other courts reviewing First Amendment restrictions on advertisements have done so on a de novo basis. See, e.g., DiLoreto v. Downey Unified Sch. Dist. Bd. of Ed., 196 F.3d 958, 964 (9th Cir.1999) (holding that de novo review was required whenever "a district court upholds a restriction on speech," in case involving whether school district could refuse to post religious advertisement on high school's baseball field fence), cert. denied, 529 U.S. 1067, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000); Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth., 148 F.3d 242, 246 (3d Cir.1998) (Christ's Bride) (holding "independent examination" was required in case involving issue of whether transportation authority had violated antiabortion group's free speech rights by removing group's advertisement), cert. denied, 525 U.S. 1068, 119 S.Ct. 797, 142 L.Ed.2d 659 (1999); AIDS Action Comm. of Mass., Inc. v. Massachusetts Bay Transp. Auth., 42 F.3d 1, 7 (1st Cir.1994) (AIDS Action )(concluding that plenary review was required in mixed fact/law matters implicating core First Amendment concerns in case involving question of whether transit authority's rejection of AIDS's group's advertisement because of sexually explicit language violated First Amendment); but see Planned Parenthood Ass'n v. Chicago Transit Auth., 767 F.2d 1225, 1228-29 (7th Cir.1985) (Planned Parenthood) (stating that de novo review applies only to cases in which appellant claims that its First Amendment rights have been abridged and applying clearly erroneous standard because government/appellant claimed only that its property interest in excluding respondent's message from its trains and buses had been wrongly restricted); Multimedia Publ'g Co. v. Greenville Spartanburg Airport Dist., 991 F.2d 154, 160 (4th Cir.1993) (following Planned Parenthood.)
While we ultimately conclude that this case can be resolved on the narrow and unique facts presented, the principle of de novo review remains inviolate as the primary issue involved is the alleged violation of plaintiff's First Amendment rights to free speech. We apply such standard of review here.

III.

A.
Critical to any determination of the rights of the respective parties is the identification of the appropriate forum sought by the speaker to express his views. In defining the forum, the Supreme Court in Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 801, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567, 579 (1985), focused on the "access sought by the speaker." While the parties devote extensive discussion to interpretation of the trial judge's findings regarding forum, ultimately, they agree that the appropriate forum is the advertising section of the Magazine. We agree with the parties and conclude that the advertising section was the appropriate forum. Any suggestion that the forum was anything other than the advertising section is misplaced.
In his oral opinion, the trial judge said:
Although I agree with the analysis of the plaintiff with regard to the identity of the forum, I think that one must look to the total context in which the problem arises. And I think that you can get a greater understanding for what is happening here if one doesn't limit the forum *688 to just the advertising section of the magazine but looks at the magazine as a whole.
To the extent that the judge alluded to the forum as the entire Magazine, he erred, a fact not disputed by plaintiff. To the extent that the judge commented that the issue must be addressed in the context of all of the factual circumstances attendant to this case, he was correct.

B.
Certain basic principles govern our analysis of the significance of this agreedupon forum and the respective rights of the parties once the forum is identified. Because the Magazine is owned by defendant, a state actor, the constitutionality of defendant's regulation of private speech in the Magazine is subject to forum analysis. The right to use government property for private expression depends on whether the property, by law or tradition, has been given the status of a public or nonpublic forum or has been designated for specific official use. See Cornelius, supra, 473 U.S. at 800, 105 S.Ct. at 3447-48, 87 L.Ed.2d at 578.
In Cornelius, the Supreme Court discussed forum analysis, explaining that it provided a means of determining when the "[g]overnment's interest in limiting the use of its property for its intended purpose outweighs the interest of those wishing to use the property for other purposes." 473 U.S. at 800, 105 S.Ct. at 3448, 87 L.Ed.2d at 578; see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-47, 103 S.Ct. 948, 955-56, 74 L.Ed.2d 794, 804-05 (1983) (introducing the concept of forum analysis and holding that an interschool mail system was a nonpublic forum).
The Court identified three types of fora: traditional public, designated public, and nonpublic. In a traditional public forum, such as streets and parks, speakers may be excluded only when necessary to serve a compelling state interest and the exclusion is narrowly tailored. See Cornelius, supra, 473 U.S. at 800, 105 S.Ct. at 3448, 87 L.Ed.2d at 578. In a designated public forum, where the government has "intentionally designated a place or means of communication" for limited, public discourse, speakers cannot be excluded without a compelling governmental interest. Ibid. Where the forum is nonpublic, however, the government may restrict speech so long as the restrictions are reasonable and not "an effort to suppress expression merely because public officials oppose the speaker's view." Ibid.
Distinctions have been made between designated public forums and limited public forums,[4] which are defined as a subcategory of a designated public forum, wherein a limited public forum is a "type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics." DiLoreto, supra, 196 F.3d at 965 (emphasis added); see also New York Magazine v. Metropolitan Transp. Auth., 136 F.3d 123, 129 n. 2 (2d Cir.) (stating that Second Circuit has referred to limited public forum as subcategory of designated public forum), cert. denied, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998); Kreimer v. Bureau of *689 Police, 958 F.2d 1242, 1262 n. 21 (3d Cir. 1992) (stating that identification of limited public forum as subcategory of designated public forum was useful analytical concept). As in a nonpublic forum, in a limited public forum, restrictions that are "viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." DiLoreto, supra, 196 F. 3d at 965. Moreover, whereas a designated public forum is subject to strict scrutiny, a limited public forum is subject only to a reasonableness test. Ibid.; see also Hopper v. City of Pasco, 241 F.3d 1067, 1075 (9th Cir.), cert. denied, ___ U.S. ____, 122 S.Ct. 346, 151 L.Ed.2d 261 (2001).
In order to determine the type of forum, the Cornelius Court identified two factors for consideration: (1) the policy and practice of the government to determine whether it intended to designate the place for discussion; and (2) the nature of the property and its compatibility with expressive activity. Id. at 802, 105 S.Ct. at 3449, 87 L.Ed.2d at 580. The second factor requires a court to examine whether the "exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose." United Food & Commercial Workers Union v. Southwest Ohio Reg'l Transit Auth., 163 F.3d 341, 352 (6th Cir.1998) (United Food). These factors assist a court in determining the government's intent and involve a primarily factual inquiry. See Cornelius, supra, 473 U.S. at 802, 105 S.Ct. at 3449, 87 L.Ed.2d at 580.; see also AIDS Action, supra, 42 F.3d at 9.
As a general rule, courts have tended to find public fora when the government has permitted advertising on a wide variety of issues. See United Food, supra, 163 F.3d at 355 (finding that transit authority had created public forum in advertising space because it accepted "wide array of advertisements, including political and publicissue advertisements"); Christ's Bride, supra, 148 F.3d at 251 (finding that transit authority had created designated/limited public forum in advertising space because it accepted "broad range of ads"); New York Magazine, supra, 136 F.3d at 130 (finding that transit authority had created designated public forum in advertising space on outside of buses because it accepted both political and commercial advertisements); Planned Parenthood, supra, 767 F.2d at 1232-33 (finding that transit authority's advertising system was public forum because it allowed advertising on "wide variety of commercial, publicservice, public-issue, and political ads").
Conversely, where the government entity consistently has restricted the type of advertisement, courts have found that the advertising space was nonpublic or a limited public forum. See DiLoreto, supra, 196 F.3d at 966-67 (finding that advertising space on a school's baseball field fence was a nonpublic forum open for a limited purpose because certain subjects were excluded as "sensitive or too controversial for the forum's high school context"); Children of the Rosary v. City of Phoenix, 154 F.3d 972, 978 (9th Cir.1998) (finding that advertising space on buses was nonpublic forum because city had consistently restricted political and religious advertising), cert. denied, 526 U.S. 1131, 119 S.Ct. 1804, 143 L.Ed.2d 1008 (1999); Lebron v. National R.R. Passenger Corp., 69 F.3d 650, 656 (2d Cir.1995) (finding that billboard space owned by Amtrak was limited public forum opened for purely commercial speech because Amtrak excluded noncommercial advertisements from its billboard), cert. denied, 517 U.S. 1188, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996).
Consistency is critical to sustaining a finding that a forum is nonpublic.

*690 [C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum. A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted.
[Hopper, supra, 241 F.3d at 1076.]
In addition, when the government "acts in a proprietary capacity to raise money or facilitate the conduct of internal business," the Supreme Court has generally found a nonpublic forum. DiLoreto, supra, 196 F.3d at 966 (citing Cornelius and Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L. Ed.2d 770 (1974)). In DiLoreto, a school sold advertising space on the fence of a baseball field in order to defray athletic program expenses, selectively limiting the content of the forum through its solicitation practices, "not to create a forum for unlimited public expression." Ibid. The court found that this "type of selective access does not transform government property into a public forum." Id. at 967 (quoting Perry, supra, 460 U.S. 37, 45-47, 103 S.Ct. 948, 955-56, 74 L.Ed.2d 794, 804-05).
Here, as in DiLoreto, defendant acted in a proprietary capacity to raise money to defray the cost of the publication of the Magazine. The Magazine's stated purpose was "to promote Rutgers and its programs" and to "engender loyalty and enthusiasm for the institution." Its practice sought to limit the type of advertisements to promote Rutgers and its programs, and offer "goods and services that might benefit and be of interest to that audience so long as the nature of the goods and services is not inconsistent with the magazine's limited purposes." We determine that the forum, that is, the advertising section, was a limited public forum where defendant, through the Magazine, enunciated a policy of limited access, only accepting advertisements that were not issue-oriented.

C.
In a limited public forum, the government may exclude speech based on content and speaker identity. The restrictions on access "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum" and all the surrounding circumstances. See Cornelius, supra, 473 U.S. at 806, 105 S.Ct. at 3451, 87 L.Ed.2d at 582. The "reasonableness" analysis focuses on whether the "limitation is consistent with preserving the property for the purpose to which it is dedicated." DiLoreto, supra, 196 F.3d at 967 (citing Perry, supra, 460 U.S. at 49, 103 S.Ct. at 957, 74 L.Ed.2d at 807).
Here, the Magazine's policy against issue-oriented advertisements was adopted to avoid exposing defendant to controversy and criticism for certain positions, and its policy is reasonable and fair. See Children of the Rosary, supra, 154 F.3d at 979 (finding that city's policy against noncommercial advertising was reasonable because of city's interest in protecting revenue and maintaining neutrality on political and religious issues); Lebron, supra, 69 F.3d at 658 (concluding that Amtrak's policy of excluding noncommercial advertisements was reasonable because of Amtrak's interest in avoiding criticism and politics). That motivating principle provides an acceptable underpinning for the policy, and we determine that the Magazine's policy was facially valid.
However, this determination of facial validity does not end the inquiry. Where a restrictive policy is valid on its *691 face and the policy has been administered in a uniform and consistent manner so as not to violate other significant protections, there will be no constitutional infirmity. We recognize that as a matter of practice, the Magazine generally and consistently refused to run issue advertisements; although, the Magazine was rarely called upon to exercise this advertising prohibition. It is at this point that context becomes relevant in determining whether that consistency, a critical element in the proper exercise of restrictive regulation, has been properly exercised here.
Prior to the publication of the Magazine's Summer 1998 issue incorporating the Mulcahy article, plaintiff had advertised in the Targum and had received national publicity regarding its opposition to Big East Conference membership. The Summer 1998 issue, ostensibly focusing on Mulcahy's arrival at Rutgers and the future positive impact of such event, also aired the controversy regarding Big East Conference affiliation. What followed in the Fall 1998 issue was an advertisement placed by the Big East promoting its activity and seeking ticket sales to its conference championship to be held in March 1999. While on its face such an ad appeared to be nothing more than a promotional piece of advertising never directly addressing the issue of defendant's involvement as a competing college, in the context of the controversy discussed in the prior Magazine issue, the advertisement could reasonably have been read as an endorsement of defendant's Big East membership and reasonably have been construed as the Magazine's acquiescence in support of such efforts, albeit appearing in the limited public forum of the advertising section.
The publication of the Mulcahy article does not change the nature of the forum. That still remains as the advertising section. The Mulcahy article changes the reasonable reader's perception of how subsequent and related advertising will be read and, ultimately, whether the Magazine's treatment of these ads falls within the scope of its policy. The Magazine's reaction to plaintiff's proposed inquiry advertisement supports this conclusion. Nothing in plaintiff's advertisement suggests any position on any subject, similar to the Big East ad. It is through Owens' subjective interpretation of the identity of plaintiff that he concluded that a reasonable reader would surmise that plaintiff's benign ad contains an overt message that it opposed Big East membership. Neither the Big East ad nor the "inquiry" ad carried such a message one way or the other. The placement of the Big East ad falling on the heels of a new vision of defendant's athleticsthe Mulcahy articlecarried as much force as the placement of plaintiff's ad. And all of this was generated by the conduct of the magazine in raising the issue in the Summer 1998 issue, then accepting the Big East ad.
The Magazine violated its own policy. It published what in other circumstances would not be an issue-oriented ad in juxtaposition to a controversy and by so doing, made such ad appear issue-oriented. That action opened the forum to plaintiff to place a similarly benign ad even if, according to Owens, the identity of the advertiser bespoke its position on the subject.
Although we need not focus on the "Salute to Alumni Legislators" ad, one can easily see the application of the contextual scenario we have described applying with equal force. If a legislative ad had been placed in October 1999, within a month of a legislative election, one might readily anticipate that the timing of the ad and the identification of the incumbents would take on a different caste, especially to a nonincumbent challenger, than an ad appearing *692 one year earlier when none of those featured were standing for election.
As we have identified, the fatal flaw in defendant's position is that the Magazine did not adhere to its own policy when it accepted an advertisement in the context of a controversy, which it felt worthy of discussion and where that advertisement advanced the interests of a principal player in that controversy. We conclude that the Magazine's advertising section was a limited public forum, and the Magazine's policy against issue-oriented advertisements was reasonable and, as such, valid. See Cornelius, supra, 473 U.S. at 806, 105 S.Ct. at 3451, 87 L.Ed.2d at 582. However, once the Magazine violated its own policy by acceptance of the Big East advertisement in the context of the prior Mulcahy article, it ceded its right to similarly deny plaintiff of its opportunity to place an ad addressing the same issue.

IV.
The rejection of plaintiff's ad and acceptance of the Big East ad was viewpoint discrimination. As the trial judge correctly noted, the Magazine's policy against this issue-oriented advertisement was an "attempt to suppress an opposing view," a practice that was "prohibited." We focus on three critical facts: (1) the Magazine raised the controversy of defendant's membership in the Big East via the Mulcahy article; (2) the Magazine accepted an advertisement promoting the Big East and defendant's membership therein; and (3) the Magazine then refused plaintiff's advertisement, which, according to Owens, espoused a view opposing that same membership.
In Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 2516, 132 L.Ed.2d 700, 715 (1995), the Supreme Court explained that viewpoint discrimination, an "egregious form of content discrimination," occurs when the government "targets not subject matter, but particular views taken by speakers on a subject." The Court further observed that the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. at 829, 115 S.Ct. at 2516,132 L.Ed.2d at 715.
In Air Line Pilots Ass'n v. Department of Aviation of Chicago, 45 F.3d 1144, 1159 (7th Cir.1995), the Seventh Circuit cautioned against an overly simplistic analysis, stressing that it was important to examine "whether the proposed speech dealt with a subject that was `otherwise permissible' in a given forum." The court criticized the lower court for finding no viewpoint discrimination simply because the airport banned all political advertising, and the plaintiff's advertisement could be labeled political. Id. at 1159. Instead, the circuit court noted that a view labeled as "political" could still "exist in opposition to a view that has otherwise been included in a forum." Ibid.; see also AIDS Action, supra, 42 F.3d at 12 (finding viewpoint discrimination because the transit authority's suppression of the plaintiff's sexually suggestive condom ads could not be justified in light of the authority's publication of "overtly sexual and blatantly exploitative" ads for the movie Fatal Instinct). Consequently, the court concluded that the "proper focus" required an examination of whether the forum had previously "included speech on the same general subject matter," and if so, then "suppression of a proposed but distinct view because of some content element included in it [was] impermissible." Air Line Pilots Ass'n, supra, 45 F.3d at 1160.
The ad inviting inquires took no stand on the issue of the University's athletics program but simply read: "Rutgers 1000 *693 Invites Inquiries." Although not technically an issue advertisement, it was rejected by the Magazine as a corollary to its policy against issue advertisements; Owens explained that the ad was declined because the "very name of the organization... advocate[d] a well-known position." He elaborated that the Magazine similarly would decline to run an advertisement for "inquiries about abortion counseling or Operation Rescue or the N.R.A."
Speaker identity is a legitimate consideration in assessing the viewpoint of an ad. See Perry, supra, 460 U.S. at 49, 103 S.Ct. at 957, 74 L.Ed.2d at 807. Here, however, the Magazine only denied plaintiff access to a forum where other advertisers, such as the Big East, were permitted to speak. We reject defendant's argument that it is especially "illogical" to conclude that the Magazine sought to silence plaintiff's views when the Magazine included Seclow's viewpoint in the Mulcahy article, published several letters to the editor supporting Rutgers 1000, and printed Seclow's class note. Unlike an edited article or letter where the Magazine can "control" the message by editing information that it does not wish to publish and omit information about how alumni could affiliate themselves with plaintiff, the advertisement allows plaintiff to present the matter in a manner it deems appropriate.
We also disagree with defendant's argument regarding Owens' intent in rejecting plaintiff's advertisement. He rejected plaintiff's advertisement solely on his subjective reading of that ad, while at same time accepting the Big East advertisement on his objective reading of the language of that advertisement. Such treatment is inconsistent, and we infer the intent from Owens' actions. It is disingenuous to suggest that one advertisement is acceptable and point to the absence of language and at the same time address benign language and suggest that such advertisement advocates a certain position because of identity. Owens readily admits that he rejected plaintiff's advertisement based on its viewpoint. However, having accepted the Big East advertisement, plaintiff was entitled to its opportunity to promote its position no matter how benign it was stated. Again, context becomes a relevant and defining factor.

V.
We restate the confluence of factors giving rise to our decision. The Magazine published an article discussing the controversy regarding defendant's membership in the Big East Conference. While this did not change the relevant limited public forum from the Magazine's advertising section to the entire Magazine, it provided the context that made the acceptance of the Big East advertisement not merely one "to sell tickets," but, to a reasonable reader interested in the subject, an advocacy ad advancing and promoting a relevant party to the controversy, that is, the Big East Conference itself. The acceptance of that ad and the refusal to accept plaintiff's ad was simply a violation of the Magazine's existing policy, which we uphold.
Defendant's expressed concern that our decision will somehow obligate the Magazine to accept ads advocating or challenging gun control, the right of a woman to make reproductive choices or even the existence of the Holocaust is incorrect. So, too, the assertion that the Magazine or its counterparts at other institutions will be chilled in raising controversial subjects is likewise in error. The Magazine is free to write and articulate any position it deems appropriate without concern for abandoning its advertising policy. What will be chilled is its decision making regarding the *694 acceptance of advertising in response to such articles, but such a chilling result, ironically, is entirely consistent with its present policy against accepting issue-oriented or advocacy ads. The Magazine's failure to recognize the nexus between an ad appearing in the next issue in support of a party to a controversy may demonstrate a lapse of sensitivity, but its farreaching effect may well-serve the longrange interests of its advertising policy.
We disagree with defendant and amici curiae that our decision "jeopardizes the integrity of [the] publications" of its constituent institutions or "infringes [on] the freedom on which higher education institutions, independent and public, depend in formulating and communicating institutional views." To the contrary, our decision validates the appropriateness of a policy that precludes issue-oriented or advocacy advertising in a limited public forum such as in this case.
Our decision on this appeal does not blaze any new trails of constitutional law. We simply apply the existing law to the unique confluence of facts as we have found them and urge the Magazine to remain vigilant, but fair and equal in its application of its advertising policies, and its efforts to sanitize its advertising forum. But it must do so with the recognition that the same banality that it attributed to an ad that "merely sold tickets" may apply with equal force to a similarly unremarkable ad "seeking inquires" on the same subject matter. Both ultimately generate a perception that the advertiser is wellserving the interests of its venerated alma mater.
Affirmed.
NOTES
[1] Plaintiff's other attempts to target alumni were unavailing. For instance, in October 1998, Seclow submitted a request to defendant's alumni relations department, seeking to send a mass mailing to alumni. Assuming that defendant would not disclose personal addresses, he suggested that plaintiff could "rent" the list by submitting the mailing material to defendant and paying for all postage and handling expenses. The Assistant Vice President for Alumni Relations, Richard Lloyd, denied Seclow's request, explaining that the mailing list was "available only to school and college alumni associations and alumni groups that have officially affiliated with one of these organizations." However, Lloyd acknowledged that the Department of Alumni Relations had sent out mailings on behalf of private employers when the career services office recommended it, on the basis that it would provide alumni with job opportunities. Lloyd specifically recalled a mailing sent on behalf of a private accounting firm to accounting majors who had graduated in the last five years.
[2] At the time of trial, this section no longer existed.
[3] The Court subsequently clarified that this independent review did not extend to a trial court's rulings on credibility issues, to which an appellate court should continue to defer. See Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562, 589 (1989).
[4] The Supreme Court and other courts have used the two terms interchangeably. See Hopper v. City of Pasco, 241 F.3d 1067, 1074 (9th Cir.) (quoting Sheri M. Danz, Note, A Nonpublic Forum or A Brutal Bureaucracy? Advocates' Claims of Access to Welfare Center Waiting Rooms, 75 N.Y.U. L.Rev. 1004, 1031 n. 151 (2000) (stating that while the Supreme Court "seems to use the terms `designated public forum' and `limited public forum' interchangeably, lower courts and commentators distinguish these concepts")), cert. denied, ___U.S.____, 122 S.Ct. 346, 151 L.Ed. 2d 261 (2001).