# United States Court of Appeals
## For the Eighth Circuit
_____

No. 23-3115
_____

Bob Cajune; Cynthia Cajune; Kalynn Kay Aaker; LION 194; John Doe, #1; Mary Roe, #1-7; S.W., minor, by Kalynn Kay Aaker; C.W., minor, by Kalynn Kay Aaker; O.W., minor, by Kalynn Kay Aaker; H.W., minor, by Kalynn Kay Aaker

*Plaintiffs - Appellants*

v.

Independent School District 194; Doug Van Zyl, or any successor, in his official capacity as Superintendent of Independent School District 194

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: March 12, 2024
Filed: June 26, 2024
_____

Before GRUENDER, SHEPHERD, and GRASZ, Circuit Judges.
_____

GRUENDER, Circuit Judge.

This appeal concerns a civil rights action under 42 U.S.C. § 1983. The plaintiffs claim that the defendants discriminated against their political viewpoints in violation of the First Amendment. Certain unnamed plaintiffs also filed a motion to proceed under pseudonyms. The district court dismissed the plaintiffs' First

Amendment claims and denied the unnamed plaintiffs' motion. For the reasons set forth below, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. Background

Following the death of George Floyd in May 2020, teachers at the Independent School District 194 ("District") requested permission to display Black Lives Matter ("BLM") posters in classrooms. On September 22, 2020, the District's superintendent, Michael Baumann, explained in an email that approving the teachers' request would violate District Policy 535, which prohibits employees from engaging in "conduct that is intended to be or reasonably could be perceived as endorsing or opposing specific political issues or political candidates." At a school board meeting that same day, members of the community expressed their opposition to the District's stance. Superintendent Baumann responded that the District's position in the email was consistent with Policy 535.

At a school board "work session" on October 6, 2020, Superintendent Baumann told attendees once again that BLM posters would not be permitted in the District's schools. Superintendent Baumann presented a slideshow, which included one slide entitled "Interpretation of Policy 535." The slide included the statement that "Black Lives Matter posters are not permitted." Superintendent Baumann stated that BLM posters would not be permitted in the District's schools due to their "political dimension."

By December 2020, four school board meetings and work sessions had been substantially devoted to discussions of race. At these meetings, vocal members of the community urged District administrators to ignore Policy 535. Although Superintendent Baumann discussed the need for "policy review," the District did not alter Policy 535. In addition, neither the school board nor the superintendent expressly authorized the creation of BLM posters at these meetings. Following these

meetings, however, members of the community continued to urge District administrators to ignore Policy 535.

The District first evinced an intent to grant the teachers' request to display BLM posters in classrooms at a school board work session on March 17, 2021. At the work session, the school board reviewed a draft version of a poster series. The poster series had been designed by private activists, and two of the posters included the phrase "Black Lives Matter." The Executive Director of Communications and Public Relations, Stephanie Kass, told the school board that the purpose of the poster series was "to meet the requests of several . . . staff members looking to put up posters affirming our students and our classrooms." Superintendent Baumann acknowledged that there existed "more than one group of stakeholders" involved in the review of the posters, which prompted one of the board members to state that she would tell the public that the posters were "going through our equity group, . . . students, . . . staff, [and] advisory committees." The Director of Equity Services, Lydia Lindsoe, told the school board that a Native American student and an Asian student were going to be added to one of the posters after such "stakeholders" had expressed concern regarding a lack of diversity in the posters. Nevertheless, Superintendent Baumann told the school board, "I don't know if I would say our goal is to have them up in the schools. Our goal is to let the teachers have the opportunity and to use [the posters] if they feel it has instructional value or value in their classrooms." He elaborated that the District was not going to "hang every single one of these up all over the place. . . . [O]ur intentions aren't necessarily to go around and make sure we hang them up everywhere. It's really about what the classrooms and the teachers want to do."

Around April 2021, the District funded the poster series. The final version of the poster series was called the "Inclusive Poster Series" and included eight posters. In one final poster, the District revised a draft version to replace a blonde girl with a blonde boy. Two of the eight posters bore the phrase "Black Lives Matter" and a statement that "[a]t Lakeville Area Schools we believe Black Lives Matter and stand with the social justice movement this statement represents. This poster is aligned to

School Board policy and an unwavering commitment to our Black students, staff and community members."

Bob Cajune, who resides within the District's boundaries, asked Director Lindsoe in an email to permit posters and shirts bearing the phrases "All Lives Matter" and "Blue Lives Matter" in the District's schools. Director Lindsoe responded by email that the District did "not approve of All Lives Matter or Blue Lives Matter posters in the classrooms or other areas of the school, and teachers/school staff are not allowed to wear shirts with these sayings to school." Director Lindsoe stated that "All Lives Matter and Blue Lives Matter mottos were created specifically in opposition to Black Lives Matter" and that those messages "effectively discount the struggle the Black students have faced in our school buildings and that Black individuals face in our society as a whole." She told Cajune that the Inclusive Poster Series was "requested by many staff and families in our school communities."

Several named and unnamed plaintiffs filed a 42 U.S.C. § 1983 lawsuit against the District and its superintendent. They alleged that the District violated the First Amendment's Free Speech Clause by rejecting the All Lives Matter and Blue Lives Matter posters and shirts while permitting the BLM posters to be posted in the schools. The unnamed plaintiffs also filed a motion to proceed under pseudonyms for fear of reprisal from political activists in the "southern suburban Minneapolis metropolitan community." The defendants filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted.

The district court denied the unnamed plaintiffs' motion to proceed under pseudonyms and granted the defendants' motion to dismiss. The district court held that the unnamed plaintiffs had not sufficiently established a threat of a hostile public reaction to their lawsuit that would warrant anonymity. In addition, the district court concluded that the BLM posters constituted government speech that is not subject to scrutiny under the First Amendment's Free Speech Clause.

## II. Discussion

The plaintiffs appeal both orders. With respect to the motion to proceed under pseudonyms, the unnamed plaintiffs contend that the district court failed to properly consider their specific examples of "cancel culture" in southern Minneapolis.[1] As to the motion to dismiss, the plaintiffs assert that the content and meaning of the BLM posters were shaped by private persons and that the District merely stamped its seal of approval on the posters. The plaintiffs further assert that the District created a limited public forum when it allowed private persons to post the BLM posters on the schools' walls. Having done so, the plaintiffs contend that the District could not discriminate against their speech by rejecting the All Lives Matter and Blue Lives Matter posters and shirts.

### A. Motion to Proceed under Pseudonyms

Federal courts disfavor the use of fictitious names in legal proceedings. *See, e.g.*, *Doe v. Blue Cross & Blue Shield United*, 112 F.3d 869, 872 (7th Cir. 1997); *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992). The use of fictitious names runs afoul of the public's First Amendment interest in public proceedings and their common law right of access thereto. Proceedings are only truly public when the public knows the identities of the litigants. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 & n.17 (1980); *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067 (9th Cir. 2000). In addition, there is nothing in the Federal Rules of Civil Procedure that allows plaintiffs to proceed under pseudonyms. Rather, the Federal Rules explicitly provide otherwise. Rule 10(a) provides that "[t]he title of the complaint must name all the parties." Rule 17(a) requires that "[a]n action . . . be prosecuted in the name of the real party in interest."

---

[1]The appeal of the district court's denial of the motion to proceed under pseudonyms concerns only the unnamed adult plaintiffs. The district court allowed the minor plaintiffs to proceed using their initials.

Despite this "constitutionally-embedded presumption of openness in judicial proceedings," federal courts have allowed parties to proceed under pseudonyms in certain limited circumstances. *In re Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1247 (11th Cir. 2020). The consensus among our sister circuits is that party anonymity is only warranted when the need for anonymity outweighs countervailing interests in full disclosure. *See, e.g.*, *id.*; *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 189 (2d Cir. 2008). Thus, courts have allowed plaintiffs to use fictitious names to protect the privacy of vulnerable parties, such as children and rape victims. *See Blue Cross*, 112 F.3d at 872. In contrast, courts have declined to allow plaintiffs to proceed pseudonymously where plaintiffs feared they would face disapproval by many in their community if they prosecuted the case under their real name. *See, e.g.*, *Frank*, 951 F.2d at 324.

This circuit has not directly addressed the standard by which a litigant may proceed under a pseudonym. *See, e.g.*, *Doe v. Poelker*, 497 F.2d 1063 (8th Cir. 1974); *Doe v. Sauer*, 186 F.3d 903, 904 n.2 (8th Cir. 1999). In related cases involving the sealing of judicial records, we have held that "the court must consider the degree to which sealing a judicial record would interfere with the interests served by the common-law right of access and balance that interference against the salutary interests served by maintaining confidentiality of the information." *IDT Corp. v. eBay*, 709 F.3d 1220, 1223 (8th Cir. 2013). Absent our direct guidance on the applicable standard for litigating under a pseudonym, the district courts of this circuit have for decades applied the standard set forth by our sister circuits. *See, e.g.*, *Heather K. by Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1255-56 (N.D. Iowa 1995); *Luckett v. Beaudet*, 21 F. Supp. 2d 1029 (D. Minn. 1998); *Doe v. Washington Univ.*, 652 F. Supp. 3d 1043, 1045-46 (E.D. Mo. 2023). We see no reason to depart from a standard that aligns with our precedent involving the common law right of access to judicial proceedings. Therefore, we join our sister circuits and hold that a party may proceed under a fictitious name only in those limited circumstances where the party's need for anonymity outweighs countervailing interests in full disclosure.

The factors that are relevant to this balancing inquiry will depend on the facts of the case in question. Our sister circuits have identified several factors that may be relevant in weighing the competing interests. In *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981), the Fifth Circuit identified three factors common to those "exceptional" cases in which party anonymity was held to be justified: (1) the party seeking anonymity was challenging government activity; (2) identification threatened to reveal information of a sensitive and highly personal nature; and (3) a party would be required, absent anonymity, to admit an intention to engage in illegal conduct, thereby risking criminal prosecution. The Seventh Circuit has stated that the danger of retaliation is "often a compelling ground" in favor of anonymity. *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004). Factors that weigh against party anonymity include "whether the party's requested anonymity poses a unique threat of fundamental unfairness to the defendant," *Chiquita*, 965 F.3d at 1247, whether the public's interest in the case is furthered by requiring that the litigants disclose their identities, *see Advanced Textile Corp.*, 214 F.3d at 1068, and whether there exist alternative mechanisms that could protect the confidentiality of the litigants, *see Sealed Plaintiff*, 537 F.3d at 190. We emphasize that the aforementioned factors are non-exhaustive and that other factors, or a combination thereof, may be relevant.

Having decided the standard under which persons may proceed anonymously, we now turn to the standard of review to be applied to the grant or denial of a motion to proceed anonymously.[2] Our sister circuits have applied an abuse of discretion standard of review. *See, e.g.*, *id.*; *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 684 (11th Cir. 2001). Because a district court must exercise discretion in the course of weighing competing interests, we agree with our sister circuits that an abuse of discretion standard of review is appropriate. Under this deferential standard of review, we must affirm the district court's ruling unless the district court failed to

---

[2]This circuit has yet to issue a published decision addressing the standard of review. In an unpublished decision, we reviewed a district court's pre-service denial of a motion to file suit under a pseudonym for an abuse of discretion. *Doe v. Univ. of Ark.*, 713 F. App'x 525, 526 (8th Cir. 2018).

consider a factor that should have been given significant weight, considered an improper factor, or committed a clear error of judgment in the course of weighing proper factors. *Qwest Commc'ns Corp. v. Free Conferencing Corp.*, 920 F.3d 1203, 1205 (8th Cir. 2019).

The unnamed plaintiffs wish to remain anonymous in this litigation because they fear reprisal from political activists in southern Minneapolis. The unnamed plaintiffs contend that these political activists are part of the greater "cancel culture" movement, which seeks to punish any dissenting political viewpoints. In support of their contention, the unnamed plaintiffs reference three examples of cancel culture: (1) political activists' intentional interference with Bittersweet Bakery's business in Eagan, Minnesota; (2) HomeTown Bank's firing of Tara McNeally due to McNeally's criticism of the Shakopee School District's superintendent on Facebook; and (3) the plaintiffs in this case allegedly being assaulted and physically blocked from entering school board meetings by political activists.

We conclude that the district court did not abuse its discretion in denying the unnamed plaintiffs' motion. We acknowledge that the danger of retaliation is "often a compelling ground" in favor of anonymity. *City of Chicago*, 360 F.3d at 669. However, aside from a general reference to cancel culture, the unnamed plaintiffs do not claim any nexus between the incidents involving Bittersweet Bakery or McNeally to their case. A general reference to cancel culture alone is insufficient to establish a compelling fear of retaliation. *Cf. Chiquita*, 965 F.3d at 1247 (holding that the pseudonymous appellants' general evidence regarding harm suffered by other individuals did "not compel the conclusion that the [appellants] face[d] those risks").

With respect to the unnamed plaintiffs' allegations regarding physical assault at school board meetings, the unnamed plaintiffs do not suggest that the political activists involved in these incidents would seek to retaliate against them due to the prosecution of this lawsuit. According to the plaintiffs, the political activists blocked them from attending school board meetings so as to obtain better seats and more

influence over the school board. This behavior ceased after the plaintiffs complained. We cannot say that the district court abused its discretion in finding that this past harm did not precipitate a finding of future harm. In addition, "the district court was free to consider the named plaintiffs as comparators when weighing the pseudonymous appellants' risk of harm against the presumption of judicial openness." *See id.* at 1248. The district court noted that this lawsuit already contains three named plaintiffs who have litigated two federal lawsuits asserting their viewpoints for years without apparent incident. Therefore, we affirm the district court's denial of the motion to proceed under pseudonyms.

## B. Motion to Dismiss

Dismissal under Rule 12(b)(6) is not appropriate when a complaint contains sufficient factual matter, which, when accepted as true and viewed in the light most favorable to the nonmoving party, states "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard is not a "probability requirement"; rather, it requires a plaintiff to show that success on the merits is more than a "sheer possibility." *Id.* Thus, a complaint "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

To avoid dismissal in this case, the plaintiffs must plead facts allowing a court to draw the reasonable inference that (1) the government-speech doctrine does not bar their claim and (2) the defendants unconstitutionally discriminated against their speech on the basis of its viewpoint. The district court dismissed the complaint after concluding that the government-speech doctrine barred the plaintiffs' claims. We review *de novo* the district court's decision to dismiss the complaint under Rule 12(b)(6). *See Sorenson v. Sorenson*, 64 F.4th 969, 975 (8th Cir. 2023).

## 1. Government-Speech Doctrine

The First Amendment's Free Speech Clause provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009). "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 251 (2022). The Constitution "relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Id.* at 252.

In some situations, difficulties can arise in distinguishing between government speech and government regulation of private expression. *Id.* To determine whether the government intends to speak for itself or to regulate private expression, we conduct a "holistic inquiry," looking to (1) "the history of the expression at issue," (2) "the public's likely perception as to who (the government or a private person) is speaking," and (3) "the extent to which the government has actively shaped or controlled the expression." *Id.*

*First*, we look to the history of the expression at issue. We consider both the general history of posting messages on school walls as well as the specific history of the District in allowing similar messages to be posted on its walls. *See id.* at 253-55. As to general history, the parties do not dispute that schools have traditionally controlled and communicated messages on posters placed on their walls. The District's specific history, however, tells another story. The District had not previously allowed private individuals to display a poster series like the Inclusive Poster Series on school walls. Indeed, Superintendent Baumann attempted on multiple occasions to exclude the BLM posters from the District, but the District acquiesced to the wishes of private persons after facing backlash from members of the community.

The District contends our inquiry into specific history is too "narrow" and that such a narrow inquiry would require courts to find a "mirror image historical analogy" to the conduct at issue. According to the District, we should look only to whether "school districts historically have and will continue to communicate messages of support for [their] students through posters on building walls." We agree with the District that a mirror image historical analogy is not required. But the analysis the District would have us adopt is indistinguishable from the analysis we have already conducted with respect to general history. Moreover, our inquiry into specific history aligns with that of the Supreme Court in *Shurtleff*. In *Shurtleff*, several plaintiffs raised a First Amendment challenge to the City of Boston's refusal to raise what the plaintiffs described as a "Christian flag." *Id.* at 248. In evaluating the first factor, the Court considered the general history of flag flying as well as the specific details of Boston's flag-flying program. *Id.* at 253-55. The Court concluded that evidence supported the plaintiffs' characterization of Boston's flag-flying program as private expression because Boston had strayed from its prior practice regarding flag-flying by rejecting the plaintiffs' flag. *Id.* Similarly, here, the District strayed from its prior practice by allowing its employees to display the Inclusive Poster Series on school walls.

The district court found that the first factor favored the District's claim of government speech because the District "reviewed, authorized, and provided the posters to support staff [and students]." In drawing this conclusion, the district court improperly weighed the facts and construed them in the light most favorable to the *defendants*. The district court did not consider the involvement of private actors in the design and adoption of the posters. For instance, Superintendent Baumann told the school board that the District's goal was to allow "teachers" to use the BLM posters if those teachers felt that the posters had instructional value.[3] In addition, Director Kass told Cajune that the posters were "requested by many staff and

---

[3]We do not attribute the statements and actions of the individual teachers to the District. *See Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003 (9th Cir. 2000) (distinguishing between a "teacher" and the "Los Angeles Unified School District").

-11-

families" in the District. When viewing the facts in the light most favorable to the *plaintiffs*, these statements (and others) support a finding of private speech. Thus, while general history weighs in the District's favor, specific history weighs in favor of the plaintiffs.

*Second*, we consider the public's likely perception as to who—the government or a private person—is speaking. The District left to the discretion of individual teachers the decision of whether to post the BLM posters in their classrooms. The teachers were not required to display the posters in their classrooms. The location of BLM posters in the teachers' classrooms, as well as the discretion provided to teachers in choosing whether to display the posters at all, support a finding of private speech. *See Summum*, 555 U.S. at 467 (noting that the location where a message is displayed can affect the public's perception of who is speaking).

The District contends that "[a]ny reasonable member of the public would look at the [Inclusive] Poster Series and undoubtedly understand" the District to be communicating a message in support of its students and their academic achievement. To bolster its contention, the District points to several statements the District made during school board meetings indicating it approved of the BLM posters. The District also emphasizes that the posters contain the District's logo, slogan, website link, and a statement that "[t]his poster is aligned to School Board policy and an unwavering commitment to our Black students, staff[,] and community members." The District would have us look solely to these indications of its approval as decisive while ignoring statements made by it that are indicative of private speech. On a motion to dismiss, we must view the facts in the light most favorable to the *plaintiffs*. Furthermore, the District would have us do what the Supreme Court admonished against in *Matal v. Tam*, 582 U.S. 218, 235 (2017). In *Matal*, the Court warned courts to be wary of situations where the government has "dangerous[ly] misuse[d]" the government-speech doctrine by attempting to pass off certain speech as government speech by "simply affixing a government seal of approval." *Id.* We cannot say that the posters are government speech solely on the basis that the District affixed its seal of approval on them. Thus, with the facts viewed in the light most

-12-

favorable to the plaintiffs, we find that the public would perceive private persons, and not the District, as having spoken through the BLM posters.

*Third*, we look to the extent to which the government has actively shaped or controlled the expression. The District contends it "retained complete control over the [BLM] posters." However, Superintendent Baumann disclaimed District involvement with the posters when he told the school board, "I don't know if I would say our goal is to have them up in the schools. Our goal is to let the teachers have the opportunity and to use [the posters] if they feel it has instructional value or value in their classrooms."[4] District administrators confirmed on several occasions that the idea of the Inclusive Poster Series originated with private persons, including "staff and families" in the District. Moreover, the District did not prescribe the display of posters on specific walls or on any walls at all. Rather, it allowed individual teachers to make that decision. The District's statements and actions show that it relinquished control to private actors.

The district court concluded that, given the District's review process and final approval authority over the BLM posters, the District "could have simply adopted the posters without alteration, and still the posters would be considered the District's speech." The district court's conclusion runs afoul of the Supreme Court's pronouncement in *Matal*; private speech cannot be passed off as government speech

---

[4]The District claims that only the school board can speak on behalf of the District and that the superintendent's remarks cannot be imputed to it because District Policy 302 provides that the superintendent can only make "suggestions regarding policies, regulations, rules and procedures deemed necessary for the [District]." According to that same policy, however, the superintendent is the "chief executive officer of the school system," "an ex-officio member of the [school board]," and is in "charge of the administration of the schools." Even if we were to assume that only the school board as a collective body could speak on behalf of the District, we find that the school board maintained a passive stance with regard to the Inclusive Poster Series. The idea of the Inclusive Poster Series did not originate with the school board, nor did the school board direct the design and content of the posters.

-13-

"by simply affixing a government seal of approval." *Id.* Without more, the mere existence of a review process with approval authority is insufficient by itself to transform private speech into government speech.

Government speech requires that a government shape and control the expression. In *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200 (2015), the Supreme Court evaluated whether the issuance of specialty license plates by Texas constituted government speech.[5] In issuing specialty license plates, Texas had a review process and final approval authority over the content of the plates. *Id.* at 213. However, the mere existence of these elements did not dissuade the Court from inquiring into whether Texas had "*actively* exercised" its "*sole* control over the design, typeface, color, and alphanumeric pattern for all license plates." *Id.* (emphasis added). Here, by contrast, the District stated that the Inclusive Poster Series was reviewed by an "equity group," "students," "staff," and "other advisory committees." The District's sole involvement was to replace a blonde girl in one of the posters with a blonde boy. Thus, the District maintained a passive role in the design of the posters.

Applying the government-speech doctrine holistically, we conclude the plaintiffs have pleaded sufficient facts to allow a court to draw the plausible inference that the BLM posters are expressions of private persons. *See Ashcroft*, 556 U.S. at 678. The district court erred in finding otherwise.

## 2. Viewpoint Discrimination

Having concluded that dismissal is not warranted under the government-speech doctrine, we turn to the question of whether the plaintiffs have alleged a plausible claim of unconstitutional viewpoint discrimination. A government engages in viewpoint discrimination when "the specific motivating ideology or the

---

[5]The Court has described *Walker* as "likely mark[ing] the outer bounds of the government-speech doctrine." *Matal*, 582 U.S. at 238.

-14-

opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

The extent to which a government can regulate speech on public property depends on the designation of the forum in which an individual may speak. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985). A forum can be public or nonpublic in nature. *Id.* The mere fact that a government owns the property in question does not make the property a public forum. *Id.* at 799-800. Rather, a government has the "power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 800. To ascertain whether a government intends to designate a place not traditionally open to assembly and debate as a public forum, we consider "the policy and practice of the government" and "the nature of the property and its compatibility with expressive activity." *Id.* at 802. Specifically, in assessing the nature of various fora, this circuit has considered the physical characteristics of a venue, the typical use of the specific venue, the venue's function and objective purpose, and the government's intent for the venue. *Sessler v. City of Davenport*, 102 F.4th 876, 882 (8th Cir. 2024). A public forum is not created "in the face of clear evidence of a contrary intent" or "when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803.

One type of public forum—the limited public forum—exists when a government "reserve[s] a forum for certain groups or for the discussion of certain topics." *Walker*, 576 U.S. at 215; *see also Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1225 (11th Cir. 2017) (explaining that the term "limited public forum" used to be synonymous with "nonpublic forum" but that recent Supreme Court cases had clarified the distinction). When a government creates a limited public forum, it "must respect the lawful boundaries it has itself set." *Rosenberger*, 515 U.S. at 829. Thus, in a limited public forum, a government is prohibited from discriminating against speech on the basis of its viewpoint. *Id.* at 829-30.

Here, the plaintiffs claim that the District created a limited public forum when it allowed private persons to display BLM posters on school walls. Because the

-15-

District permitted such actions, the plaintiffs contend that the District could not discriminate against their speech based on its viewpoint. Having considered the "policy and practice" of the District, we agree with the plaintiffs. *Cornelius*, 473 U.S. at 802. When the District allowed private persons to display the Inclusive Poster Series on school walls, it deviated from its prior practice restricting the display of such posters. In doing so, the District created a limited public forum, thereby opening school walls to the discussion of similar topics.

The District contends it did not create a limited public forum because Policy 535 specifically provides that "[a]ll school district property and facilities are nonpublic fora." We agree with the Ninth Circuit's statement in *Hopper v. City of Pasco*, 241 F.3d 1067, 1075 (9th Cir. 2001) that "an abstract policy statement purporting to restrict access to a forum is not" conclusive of the nature of the forum. Rather, "[w]hat matters is what the government actually does—specifically, whether it consistently enforces the restrictions on use of the forum that it adopted." *Id.* Here, the District created a limited public forum by not consistently enforcing the restrictions it had placed on the display of posters on school walls.

Having created a limited public forum, the District could not discriminate against speech on the basis of its viewpoint. According to the District, however, it rejected Cajune's request because the phrases "All Lives Matter" and "Blue Lives Matter" "were created specifically in opposition to Black Lives Matter." That was impermissible viewpoint discrimination in that the rationale for the restriction was prompted by what the District viewed as the speaker's "motivating ideology" or their "opinion or perspective." *Rosenberger*, 515 U.S. at 829. Therefore, we conclude that the plaintiffs have shown that success on their First Amendment claim is more than a "sheer possibility." *Ashcroft*, 556 U.S. at 678. We reverse the district court's dismissal of the complaint under Rule 12(b)(6).

-16-

## III. Conclusion

For the foregoing reasons, we affirm the district court's denial of the motion to proceed under pseudonyms, reverse the district court's dismissal of the complaint, and remand for further proceedings consistent with this opinion.

_____